1 | **JOSHUA L. DRATEL**
Admitted *Pro Hac Vice*
2 | **ALICE L. FONTIER**
California State Bar No.229994
3 | DRATEL & MYSLIWIEC, P.C.
2 Wall Street, 3rd Floor
4 | New York, New York 10005
Telephone:  (212) 732-0707
5 |
6 | Attorneys for Basaaly Moalin
7 |
8 |
9 | UNITED STATES DISTRICT COURT
10 | SOUTHERN DISTRICT OF CALIFORNIA
11 | **(HONORABLE JEFFREY T. MILLER )**
12 |
13 | UNITED STATES OF AMERICA,                    )      Case No. 10-CR-4246 (JM)
                                                 )
14 |                        Plaintiff,            )      Date: February 9, 2011
                                                 )      Time: 9:00 a.m.
15 | v.                                           )
                                                 )      STATEMENT OF FACTS AND
16 | BASAALY MOALIN (1), *et. al.*,               )      MEMORANDUM OF POINTS
                                                 )      AND AUTHORITIES IN
17 |                        Defendant.            )      SUPPORT OF MOTIONS
     _____         )
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

# TABLE OF CONTENTS

Table of Contents.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   i

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   x

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

ARGUMENT

POINT I

THE FRUITS OF ELECTRONIC SURVEILLANCE
AND ANY OTHER MEANS OF COLLECTION
CONDUCTED PURSUANT TO THE FOREIGN
INTELLIGENCE SURVEILLANCE ACT SHOULD
BE SUPPRESSED BECAUSE THEY WERE
OBTAINED IN VIOLATION OF THE STATUTE
AND/OR THE FIRST AND FOURTH AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

A.    *The Foreign Intelligence Surveillance Act ("FISA").* . . . . . . . . . . . . . . . . . . . .   8

    1.    *The History, Purposes, and Provisions of FISA.* . . . . . . . . . . . . . . . . . . . . . . . . .   8

    2.    *Challenges to the Admissibility of FISA-Generated Evidence..* . . . . . . . . . . . . . . . . . . .   13

        a.    *Mr. Moalin Has Standing to Challenge the FISA Surveillance* . . . . . . . . . . . . . .   13

        b.    *Disclosure of the FISA Warrant Applications* . . . . . . . . . . . . . . . . . . . . . . . . . .   13

B.    *Mr. Moalin's Challenges to the FISA Electronic Surveillance In This Case.* . . . . . . . . . . . . . . .   14

    1.    *The FISA Applications Failed to Establish the Requisite Probable Cause.* . . . . . . . . . . . .   14

        a.    *The Elements of Probable Cause Under FISA.* . . . . . . . . . . . . . . . . . . . . . . . . . .   14

        b.    *The "Agent of a Foreign Power" Requirement* . . . . . . . . . . . . . . . . . . . . . . . . . .   15

        c.    *The Nature and Origins of the Information In the FISA Applications.* . . . . . . . . .   15

            i.    *The Limits of "Raw Intelligence".* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

            ii.    *Illegitimate and/or Illegal Sources of Information.* . . . . . . . . . . . . . . . . . .   16

                (A)    *The Warrantless Terrorist Surveillance Program* . . . . . . . . . . . . . .   16

                (B)    *Surveillance Pursuant to the FISA Amendments Act* . . . . . . . . . . .   17

        d.    *FISA's Prohibition On Basing Probable Cause Solely On a
"United States Person's" Protected First Amendment Activity.* . . . . . . . . . . . . . .   18

    2.    *The FISA Applications May Contain Intentional or Reckless Falsehoods
or Omissions In Contravention of* Delaware v. Franks, *438 U.S. 154 (1978).* . . . . . . . . . .   19

    3.    *The Collection of Foreign Intelligence Information Was Not a Significant
Purpose of the FISA Surveillance, and Was Not the Primary Purpose Thereof.* . . . . . . . .   21

4.   *The FISA Applications May Not Have Included the Required Certifications* . . . . . . . . . . 22

5.   *The FISA Applications, and the FISA Surveillance, May Not Have Contained or Implemented the Requisite Minimization Procedures* . . . . . . . . . . . . . . . . . . 23

C.   *The Underlying FISA Applications and Other Materials Should Be Disclosed to Defense Counsel to Enable Them to Assist the Court, and On Due Process Grounds* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

1.   *Disclosure of FISA Materials to the Defense Pursuant to §1806(f).* . . . . . . . . . . . . . . . 24

2.   *Disclosure of FISA Materials to the Defense Pursuant to §1806(g)* . . . . . . . . . . . . . . . . 25

3.   *Ex Parte Proceedings Are Antithetical to the Adversary System of Justice.* . . . . . . . . . . . 25

POINT II

ANY EVIDENCE RECOVERED PURSUANT
TO THE SEARCH WARRANT EXECUTED
AT MR. MOALIN'S RESIDENCE SHOULD
BE SUPPRESSED BECAUSE THE INFORMATION
IN THE WARRANT APPLICATION WAS STALE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

A.   *Statement of Facts.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

B.   *The Facts Supporting the Search Warrant Are Stale, and Therefore Do Not Constitute Probable Cause.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

POINT III

MR. MOALIN'S POST-ARREST, POST-
INDICTMENT STATEMENT MUST BE
SUPPRESSED BECAUSE IT WAS
OBTAINED IN VIOLATION OF HIS
SIXTH AMENDMENT RIGHT TO COUNSEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

POINT IV

THE GOVERNMENT SHOULD BE COMPELLED
TO PRODUCE EXCULPATORY MATERIAL AND
INFORMATION REFERRED TO IN THE FIG ASSESSMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

POINT V

MR. MOALIN RESPECTFULLY JOINS IN
THOSE MOTIONS BY HIS CO-DEFENDANTS
THAT INURE TO MR. MOALIN'S BENEFIT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

POINT VI

REQUEST FOR LEAVE TO FILE FURTHER MOTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

# TABLE OF AUTHORITIES

## CASES

*ACLU v. National Security Agency*, 438 F. Supp. 2d 754 (E.D. Mich. 2006). . . . . . . . . . . . . . . . . . . . . 17

*Alderman v. United States*, 394 U.S. 165 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26,27,28

*American-Arab Anti-Discrimination Committee v. Reno*, 70 F.3d 1045 (9th Cir. 1995). . . . . . . . . . . . . 26

*Amnesty International v. Clapper*, 638 F.3d 118 (2d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . 17,18

*Brady v. Maryland*, 373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,2,5,25,34,35

*Brinegar v. United States*, 338 U.S. 160 (1949). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Chambers v. Maroney*, 399 U.S. 42 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Franks v. Delaware*, 438 U.S. 154 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,7,19,21,27,28

*Gelbard v. United States*, 408 U.S. 41 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Humanitarian Law Project v. Holder*, ___U.S. ___, 130 S. Ct. 2705 (2010). . . . . . . . . . . . . . . . . . . 19

*Illinois v. Gates*, 462 U.S. 213 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*In re All Matters Submitted to the Foreign Intelligence Surveillance Court*,
     218 F. Supp. 2d 611 (FISC). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20,28

*In re Grand Jury Proceedings*, 347 F.3d 197 (7th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re Kevork*, 788 F.2d 566 (9th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re National Security Agency Telecommunications Records Litigation*,
     451 F. Supp.2d 1215 (D. Ore. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Sealed Case*, 310 F.3d 717 (Foreign Int. Surv. Ct. Rev. 2002). . . . . . . . . . . . . . . . . . . . . . . 7,20,28

*Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123 (1951). . . . . . . . . . . . . . . . . . . . . . 26

*Jones v. United States*, 362 U.S. 257 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Kiareldeen v. Reno*, 71 F. Supp. 2d 402 (Dist. N.J. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Latif v. Obama*, ___ F.3d ___, 2011 WL 5431524 (D.C. Cir. October 14, 2011). . . . . . . . . . . . . . . . . 16

*Maryland v. Pringle*, 540 U.S. 366 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Massiah v. United States,* 377 U.S. 201 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Mayfield v. United States,* 504 F. Supp.2d 1023 (D. Ore. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*McCarthy v. Dearmit*, 99 Pa. 63 (S.C. PA 1881). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Montejo v. Louisiana*, 556 U.S. 778 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Patterson v. Illinois*, 487 U.S. 285 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Powell v. Alabama,* 287 U.S. 45 (1932). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Segura v. U.S.,* 468 U.S. 796 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Stein v. Department of Justice & Federal Bureau of Investigation,*
          662 F.2d 1245 (7th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Abu Jihaad*, 630 F.3d 102 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . 7,8

*United States v. Abuhamra*, 389 F.3d 309 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Arroyo-Angulo*, 580 F.2d 1137 (2d Cir. 1978). . . . . . . . . . . . . . . . . . . . . 26

*United States v. Atkin*, 107 F.3d 1213 (6th Cir. 1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Belfield*, 692 F.2d 141 (D.C. Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . 8,23,24,28

*United States v. Bennett*, 219 F.3d 1117 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Blackmon*, 273 F.3d 1204 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . 20,22

*United States v. Carpenter,* 360 F.3d 591 (6th Cir. 2004).. . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Cavanagh*, 807 F.2d 787 (9th Cir. 1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Coplon,* 185 F.2d 629 (2d Cir. 1950).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Duggan,* 743 F.2d 59 (2d Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . 9,20,24

*United States v. Foster,* 711 F.2d 871 (9th Cir.1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Greany,* 929 F.2d 523 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Hammond.* 351 F.3d 765 (6th Cir. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Hendricks,* 743 F.2d 653 (9th Cir.1984). . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Henry,* 447 U.S. 264 (1980).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. James Daniel Good Real Property, et. al.*, 510 U.S. 43 (1993). . . . . . . . . . 26

*United States v. Johnson*, 952 F.2d 565 (1st Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Kalustian*, 529 F.2d 585 (9th Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Kimball*, 884 F.2d 1274 (9th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Madori*, 419  F.3d 159 (2d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Martino,* 664 F.2d 860 (2d Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Marzook,* 412 F. Supp.2d 913 (N.D. Ill. 2006). . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Massiah*, 377 U.S. 201 (1964).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33,34

1  *United States v. Megahey*, 553 F. Supp. 1180 (E.D.N.Y. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

2  *United States v. Meling*, 47 F.3d 1546 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

3  *United States v. Moussaoui*, 382 F.3d 453 (4ᵗʰ Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

4  *United States v. Ott*, 827 F.2d 473 (9th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

5  *United States v. Pelton*, 835 F.2d 1067 (4ᵗʰ Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8,9

6  *United States v. Posey*, 864 F.2d 1487 (9th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

7  *United States v. Sattar*, 2003 U.S. Dist. LEXIS 16164 (S.D.N.Y. Sept. 15, 2003). . . . . . . . . . . . . . . . . 25

8  *United States v. Satterfield*, 417 F.Supp. 293 (S.D.N.Y. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

9  *United States v. Spanjol*, 720 F. Supp. 55 (E.D. Pa. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

10  *United States v. United States District Court (Keith, J.)*, 407 U.S. 297 (1972). . . . . . . . . . . . . . . . . . . . 8

11  *United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

12  *United States v. Wade,* 388 U.S. 218 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

13  *Wong Sun v. United States*, 83 U.S. 471 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

14  **STATUTES**

15  US Const. Amend. I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,6,7,8,13,18,19,24

16  US Const. Amend. IV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,2,6,7,8,9,17,19,20,26,30

17  US Const. Amend. V. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20,25,33

18  US Const. Amend. VI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,2,32,33,34

19  18 U.S.C. App. III (CIPA). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

20  18 U.S.C. § 99 (Omnibus Crime Control and Safe Streets Act). . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

21  18 U.S.C. § 956. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

22  18 U.S.C. § 1956(a)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

23  18 U.S.C. § 1956(h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

24  18 U.S.C. § 2339A(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

25  18 U.S.C. § 2339B(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

26  18 U.S.C. § 2518(1)(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

27  50 U.S.C. § 1801. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28  50 U.S.C. § 1801(a)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

1   50 U.S.C. § 1801(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9,10

2   50 U.S.C. § 1801(b)(2)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

3   50 U.S.C. § 1801(b)(2)(E). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

4   50 U.S.C. § 1801(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

5   50 U.S.C. § 1801(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

6   50 U.S.C. § 1801(h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,23

7   50 U.S.C. § 1801(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

8   50 U.S.C. § 1801(k). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

9   50 U.S.C. § 1802(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

10  50 U.S.C. § 1803. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

11  50 U.S.C. § 1804. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

12  50 U.S.C. § 1804(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

13  50 U.S.C. § 1804(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

14  50 U.S.C. § 1804(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

15  50 U.S.C. § 1804(a)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

16  50 U.S.C. § 1804(a)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

17  50 U.S.C. § 1804(a)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

18  50 U.S.C. § 1804(a)(6)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

19  50 U.S.C. § 1804(a)(6)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

20  50 U.S.C. § 1804(a)(6)(E). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,22

21  50 U.S.C. § 1804(a)(7). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

22  50 U.S.C. § 1804(a)(8). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

23  50 U.S.C. § 1804(a)(9). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

24  50 U.S.C. § 1804(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

25  50 U.S.C. § 1805(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

26  50 U.S.C. § 1805(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

27  50 U.S.C. § 1805(a)(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,13,14,15,18,19

28  50 U.S.C. § 1805(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

50 U.S.C. § 1805(a)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,13,22

50 U.S.C. § 1805(d)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13,23

50 U.S.C. § 1805(d)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13,23

50 U.S.C. § 1806(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

50 U.S.C. § 1806(e)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

50 U.S.C. § 1806(e)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

50 U.S.C. § 1806(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13,14,24,25,28,29

50 U.S.C. § 1806(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14,25,28,29

50 U.S.C. § 1806(k). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

50 U.S.C. § 1824(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

50 U.S.C. § 1825(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

50 U.S.C. § 1825(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

50 U.S.C. § 1881(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17,18

## OTHER

*Commission on CIA Activities Within the United States*, Report to the President (1975). . . . . . . . . . . . . . 8

Final Report of the Select Committee to Study Governmental Operations with Respect to
   Intelligence Activities, S. Rep. No. 94-755, 94th Cong., 2d Sess. (1976). . . . . . . . . . . . . . . . . . . . . 8

Report to Congress on Implementation of Section 1001 of the USA PATRIOT Act, March 8, 2006
(hereinafter "DoJ IG Report"), available at <http://www.usdoj.gov/oig/special/s0603/final.pdf>. . . . . . 21

Schwartz, *Oversight of Minimization Compliance Under the Foreign Intelligence Surveillance
   Act:  How the Watchdogs are Doing Their Job*, 12 RUTGERS L.J. 405 (1981). . . . . . . . . . . . . . . . 24

**INTRODUCTION**

This Memorandum of Law is submitted on behalf of Defendant Basaaly Moalin in support of his pretrial motions to:

(1)        suppress all interceptions made and electronic surveillance conducted pursuant to the Foreign Intelligence Surveillance Act (hereinafter "FISA"), 50 U.S.C. §1801, *et seq*., and any fruits thereof, and/or for disclosure of the underlying applications for FISA warrants, and/or an evidentiary hearing on the issues, because the FISA surveillance was obtained and conducted in violation of FISA and the First and Fourth Amendments to the U.S. Constitution;

(2)        suppress any and all evidence seized in the search of Mr. Moalin's residence, and any fruits thereof, because the information in the search warrant application was stale, and did not amount to probable cause at the time of the search;

(3)        suppress Mr. Moalin's post-arrest statements to law enforcement agents, and any fruits thereof, because the post-indictment statements were made in violation of Mr. Moalin's Sixth Amendment right to counsel;

(4)        compel the government to produce all exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963);

(5)        grant leave for Mr. Moalin to join any of the co-defendant's motions that inure to his benefit; and

(6)        grant leave to file further motions.

As detailed below in POINT I, while the applications underlying the FISA electronic surveillance has yet to be disclosed to defense counsel, there are a number of issues the Court must examine with respect to FISA. In addition, certain discovery – in particular, a June 15, 2011, Federal Bureau of Investigation (hereinafter "FBI") San Diego Field Intelligence Group Assessment – raises substantial question whether the FISA surveillance violated the prohibition on basing such surveillance solely on a U.S. citizen's protected First Amendment activities.

Disclosure of the FISA applications to defense counsel – who possess the requisite security clearance – is also necessary to an accurate determination of the legality of the FISA surveillance, as

1   otherwise the defense will be completely in the dark with respect to the basis for the FISA surveillance,

2   and the Court will not have the benefit of the invaluable defense perspective on the key issues related to

3   determining whether the FISA surveillance was lawful.

4         Also, as discussed in POINT II, the government conducted a search of Mr. Moalin's residence

5   November 1, 2010.  The search was conducted pursuant to a search warrant.  However, the search warrant

6   was based on facts from the 2007-2008 investigation of Mr. Moalin.  That information – with the last fact

7   occurring *23 months* before the application for the search warrant was submitted – was stale, and did not

8   amount to probable cause to believe that the items sought would be found at Mr. Moalin's current

9   residence.  Thus, the search was conducted in violation of Mr. Moalin's Fourth Amendment right to be

10   free from unreasonable search and seizure.

11         In addition, as set forth in POINT III, Mr. Moalin was subjected to a three-hour interview October

12   31, 2010, at San Diego International Airport after being stopped and (upon his return to the U.S.) by

13   Transportation Security Administration personnel, and subsequently transferred to the custody of FBI

14   agents, who arrested him.  That post-arrest questioning occurred *after* Mr. Moalin had been indicted in this

15   case, yet Mr. Moalin was not informed of the Indictment, and did not have any attorney present.  Under

16   such circumstances, Mr. Moalin's waiver of his *Miranda* rights was insufficient to apprise him sufficiently

17   of his right to counsel.  Accordingly, this Court should suppress the statement made by Mr. Moalin, as it

18   was obtained in violation of his Sixth Amendment right to counsel.

19         Moreover, the June 15, 2011, FBI Field Intelligence Group Assessment noted above also, by its

20   plain language, establishes the existence of exculpatory material and information that has not yet been

21   produced.  In POINT IV, Mr. Moalin seeks an order compelling the government to produce, pursuant to

22   *Brady* and its progeny, certain specific exculpatory material.  In POINT V, Mr. Moalin also joins in his co-

23   defendants' motions to the extent they inure to his benefit.  Finally, in POINT VI, Mr. Moalin seeks leave

24   to file further motions should the government provide additional discovery in response to these motions.

25         Accordingly, it is respectfully submitted that Mr. Moalin's pretrial motions be granted in their

26   entirety.

27

28

**STATEMENT OF FACTS**

Basaaly Moalin is charged with three co-defendants in a five count Indictment with Conspiracy to Provide Material Support for Terrorism, in violation of 18 U.S.C. §2339A(a) (Count One);  Conspiracy to Provide Material Support to a Foreign Terrorist Organization ("FTO"), in violation of 18 U.S.C. §2339B(a)(1) (Count Two);  Conspiracy to Kill in a Foreign Country, in violation of 18 U.S.C. §956 (Count Three); Conspiracy to Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(a)(2)(A) and (h) (Count Four);  and Providing Material Support for Terrorism, in violation of 18 U.S.C. § 2339A(a) (Count Five).  Mr. Moalin is charged alone in Count Five;  all four defendants are charged in Counts One through Four.

Mr. Moalin was born in Somalia.  The government of Somalia was overthrown in 1992, and the country was plunged into an endless series of wars that continue essentially unabated today.  Mr. Moalin's family was forced to flee Mogadishu when his home was partially destroyed by bombs.  Mr. Moalin was left for dead by his family, but was found severely injured by a neighbor.  He then spent three months in a hospital in Mogadishu before he was able to reconnect with his family in a refugee camp near the Kenyan border.  Several months later, Mr. Moalin and his family were able to obtain refugee visas, and emigrated to the United States.  In 2002, Mr. Moalin naturalized as a United States citizen.

Although Mr. Moalin has lived his entire adult life in the United States, and considers this country his home, he maintains strong ties to Somalia.  Mr. Moalin returns to Somalia regularly, and has a wife and children living there.  In addition, Mr. Moalin was in the process of building a house for them.  His house in Somalia, and the ancestral home of his family, is in the Gelguduud region of central Somalia.  For many years this area, because of its location, has been cut off from the limited assistance of the Somali Federal Government.  The area between Mogadishu and Gelgaduud has historically been controlled by warlords.  As a result, the people of Gelgaduud, including Mr. Moalin's family and tribe, have had to form their own government.

In addition to the constant state of war, from both internal struggles, and external invasion, Somalia has suffered from long periods of drought.  In order to cope with these hardships, the people of Somalia have formed schools, orphanages, and centers for the needy.  In addition, the local populace maintains its own security force, known as "madeni."  In order to assist his family and tribe in the

1  Gelgaduud region Mr. Moalin sent money as often as possible.

2      The charges in this case stem from an allegation that Mr. Moalin, and his co-defendants,

3  transferred money to individuals in Somalia who were affiliated with *al Shabaab*, which was designated

4  February 26, 2008, as an FTO.  The Indictment alleges that during the time frame covered by the

5  Indictment, Mr. Moalin transferred approximately $8,000.00 to two individuals in Somalia.  The

6  government alleges that these transactions were for the purpose of supporting *al Shabaab*.

7      The investigation of Mr. Moalin began December 18, 2007.  *See* FBI San Diego Field Intelligence

8  Group Assessment, dated June 15, 2011 (hereinafter "FIG Assessment"), attached to the Declaration of

9  Joshua L. Dratel (hereinafter "Dratel Dec.") as Exhibit 1.  The primary investigative tool was electronic

10  surveillance of Mr. Moalin's telephone and e-mail account, both authorized pursuant to the Foreign

11  Intelligence Surveillance Act ("FISA").  The discovery provided by the government shows the earliest

12  wiretapped conversations occurred December 20, 2007.  The government has provided wiretapped

13  conversations through December 2, 2008.  Also during 2008, the FBI conducted periodic physical

14  surveillance of Mr. Moalin.

15      Following termination of the physical and electronic surveillance of Mr. Moalin, the FBI San

16  Diego Field Intelligence Group issued an assessment of his "motivation for providing financial support to

17  al-Shabaab."  *See* FIG Assesment (Exhibit 1).  That FIG Assessment was summarized in a two-page

18  partially redacted FBI Report dated June 15, 2011, created by the San Diego office (denominated in

19  discovery as GA-DOCS-000051-52).  *Id.*

20      According to the FIG Assessment:

21          [t]he San Diego FIG assesses that Moalin, who belongs to the Hawiye
           tribe/Habr Gedir clan/Ayr subclan, is the most significant al-Shabaab
22          fundraiser in the San Diego Area of Operations (AOR).  Although Moalin
           has previously expressed support for al-Shabaab, he is likely more attentive
23          to Ayr subclan issues and is not ideologically driven to support al-Shabaab.
           The San Deigo FIG assesses that Moalin likely supported now deceased
24          senior al-Shabaab leader Aden Hashi Ayrow due to Ayrow's tribal
           affiliation with the Hawiye tribe/Habr Gedir clan/Ayr subclan rather than his
25          position in al-Shabaab.  Moalin has also worked diligently to support Ayr
           issues to promote his own status with Habr Gedir elders.  The San Diego
26          FIG assesses, based on reporting that Moalin has provided direction
           regarding financial accounts to be used when transferring funds overseas
27          that he also serves as a controller for the US-based al-Shabaab fundraising
           network.

28  *Id.* (Exhibit 1).

1    Due to the lack of a central banking system in Somalia, it is necessary to utilize "*hawalas*" or
2  private money transfer centers, to send money to Somalia.  The Somali community in San Diego used the
3  Shidaal Express *hawala* to transfer money to Somalia.  Mr. Moalin also used that same *hawala*.
4  Sometime in 2009, a fraud investigation was commenced against Shidaal Express's owner.  It appears,
5  from the discovery, that the investigation of Mr. Moalin was resumed as a result of that fraud
6  investigation.  Subsequent to the fraud investigation, the Indictment against Basaaly Moalin was issued
7  October 22, 2010.     The government requested a search warrant October 29, 2010, for Mr. Moalin's
8  residence located at 3810 Winona Avenue #116, San Diego, California, and the warrant was issued.  The
9  search warrant application was based on information gathered from the 2007 through 2008 FISA
10 telephonic and e-mail electronic surveillance, and the 2008 physical surveillance of Mr. Moalin.  The
11 search of Mr. Moalin's residence was conducted November 1, 2010, the day after his arrest.

12    The next before, October 31, 2010, at approximately 7:15 a.m., Mr. Moalin had been detained at
13 San Diego International airport.  Following his detention by the Transportation Security Administration,
14 Mr. Moalin was turned over the FBI, and arrested at approximately 7:30 a.m.  At that time, he was read his
15 *Miranda* rights from an Advice of Rights form.  *See* Miranda Waiver, attached to Dratel Dec., as Exhibit
16 2.  Three hours later, at approximately 10:30 a.m., the FBI conducted a three-hour videotaped interrogation
17 of Mr. Moalin.

18    Mr. Moalin now moves for suppression of (1)  any and all evidence obtained pursuant to the FISA
19 electronic surveillance;  (2)  evidence obtained pursuant to the search of his home; and (3)  his October 31,
20 2010, post-arrest, post-indictment statement;  and to compel the government to produce *Brady* material,
21 including but not limited to documents and information referred to in the FIG Assessment.

22
23
24
25
26
27
28

## ARGUMENT

### POINT I

**THE FRUITS OF ELECTRONIC SURVEILLANCE
AND ANY OTHER MEANS OF COLLECTION
CONDUCTED PURSUANT TO THE FOREIGN
INTELLIGENCE SURVEILLANCE ACT SHOULD
BE SUPPRESSED BECAUSE THEY WERE
OBTAINED IN VIOLATION OF THE STATUTE
AND/OR THE FIRST AND FOURTH AMENDMENTS**

Discovery has revealed that a year's worth of Mr. Moalin's telephone conversations – approximately 1,800 of which the government has deemed pertinent and produced in discovery – were intercepted by the government from December 20, 2007, through December 2, 2008, pursuant to the Foreign Intelligence Surveillance Act (hereinafter "FISA").  In addition, pursuant to FISA, at least 680 pages of e-mails were intercepted from Mr. Moalin's e-mail account.[1]

As detailed below, the interceptions and e-mails the government obtained pursuant to FISA should be suppressed because the surveillance and/or collection were conducted in violation of FISA, and of the First and Fourth Amendments.  However, because defense counsel have not been provided with the underlying applications for the pertinent FISA warrants, this motion can only outline the possible bases for suppression for the Court to examine and consider.  Nevertheless, as discussed **post**, at 19-20, 23-24, discovery has provided certain documents and information that are useful in focusing on specific aspects of the FISA process that merit particular scrutiny in this case.

As a result, this motion respectfully requests that the Court:

(1)   review all applications for electronic surveillance of the defendant conducted pursuant to FISA;

(2)   order the disclosure of the applications for the FISA warrants to Mr. Moalin's counsel pursuant to an appropriate protective order;

(3)   conduct an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978);  and

---

[1]   The defense does not know how long the FISA surveillance on Mr. Moalin's e-mail account – basaaly@live.com – lasted, although discovery and the government's October 29, 2010, application for a search warrant (discussed in POINT III) indicate the government captured Mr. Moalin's e-mails at least from October 2008 through February 2009.  *See* October 29, 2010 Application for Search Warrant, at ¶ 66 (p. 28).  A copy of that Application is attached hereto as Exhibit 5.

1      (4)      as a result, suppress all FISA intercepts and seizures, and fruits thereof, derived from

2                   illegally authorized or implemented FISA electronic surveillance.

3      As set forth below, this motion identifies the following independent and alternative bases for

4 suppression:

5      (a)      the FISA applications for electronic surveillance of Mr. Moalin's telephone(s) or e-mails

6                   accounts may fail to establish probable cause that Mr. Moalin was "an agent of a foreign

7                   power;"

8      (b)      those FISA applications may contain intentional or reckless material falsehoods or

9                   omissions, and therefore may violate the Fourth Amendment principles identified in *Franks*

10                 *v. Delaware*, 438 U.S. 154 (1978);

11     (c)      the primary purpose of the electronic surveillance was to obtain evidence of domestic

12                criminal activity and not foreign intelligence information – or, conversely, capturing

13                foreign intelligence information was not a "significant" purpose of the FISA surveillance;[2]

14     (d)      the FISA surveillance may have been based impermissibly on activity protected by the First

15                Amendment;

16     (e)      the government may not have made the required certifications in the FISA applications, or

17                may have failed to obtain necessary extensions of prior FISA orders, or continued the FISA

18                surveillance after any basis for such initial surveillance was no longer valid;

19     (f)      the government may not have established or abided by the appropriate minimization

20                procedures required by FISA;

21

22      [2] Effective October 26, 2001, Congress amended §1804(a)(6)(B) through the USA PATRIOT Act to require government certification only that "*a significant* purpose" – rather than

23 "*the* purpose" – of the surveillance is to obtain foreign intelligence information. (Emphasis added). In May, 2002, the Foreign Intelligence Surveillance Court of Review, a federal court

24 empowered to review the denial of a FISA application by the FISA Court, issued its first ever opinion in its 24-year history, in which, in *dicta*, it endorsed the "significant" purpose standard's

25 constitutionality. *See In re Sealed Case*, 310 F.3d 717 (Foreign Int. Surv. Ct. Rev. 2002). *See also United States v. Abu Jihaad*, 630 F.3d 102, 120 (2d Cir. 2010), and cases cited therein. *But

26 see Mayfield v. United States,* 504 F. Supp.2d 1023 (D. Ore. 2007). While Mr. Moalin recognizes that the only Circuit decisions on this point are adverse, he nevertheless intends to

27 preserve a challenge to the constitutionality of this amendment to the extent that the post-October 26, 2001, FISA-generated interceptions, or any evidence or information derived therefrom, are

28 introduced against him in this case.

1    (g)    the government may have violated other provisions of FISA and/or the First and/or Fourth

2            Amendments in manners unknown to Mr. Moalin.

3  **A.    *The Foreign Intelligence Surveillance Act ("FISA")***

4        **1.    *The History, Purposes, and Provisions of FISA***

5        FISA, 50 U.S.C. §1801, *et seq*., was enacted in 1978 in the wake of domestic surveillance abuses

6  by federal law enforcement agencies as catalogued in Congressional Committee and Presidential

7  Commission Reports.[3]  The statute was designed to provide a codified framework for foreign intelligence

8  gathering within the confines of the United States in response to civil liberties concerns and the gap in the

9  law noted by the Supreme Court in *United States v. United States District Court (Keith, J.)*, 407 U.S. 297,

10 308-09 (1972).

11       Through FISA, Congress attempted to limit the propensity of the Executive Branch to engage in

12 abusive or politically-motivated surveillance.  FISA constituted Congress' attempt to balance the

13 "competing demands of the President's constitutional powers to gather intelligence deemed necessary to

14 the security of the Nation, and the requirements of the Fourth Amendment." H.R. Rep. No. 95-1283, at 15.

15       As a result, FISA's provisions represented a compromise between civil libertarians seeking

16 preservation of Fourth Amendment and privacy rights, and law enforcement agencies citing the need for

17 monitoring agents of a foreign power operating in the United States.  *See In re Kevork*, 788 F.2d 566, 569

18 (9th Cir. 1986) (FISA "was enacted in 1978 to establish procedures for the use of electronic surveillance in

19 gathering foreign intelligence information. . . .  The Act was intended to strike a sound balance between

20 the need for such surveillance and the protection of civil liberties") (quotation omitted).  Since its

21 inception, FISA's constitutionality has been upheld without exception.[4]

22  _____

23        [3]  *See, e.g.,* FINAL REPORT OF THE SELECT COMMITTEE TO STUDY GOVERNMENTAL
     OPERATIONS WITH RESPECT TO INTELLIGENCE ACTIVITIES, S. Rep. No. 94-755, 94th Cong., 2d

24   Sess. (1976);  *Commission on CIA Activities Within the United States*, Report to the President
     (1975) (commonly referred to as the "Rockefeller Commission Report").  *See also United States*

25   *v. Belfield*, 692 F.2d 141, 145 (D.C. Cir. 1982) ("[r]esponding to post-Watergate concerns about
     the Executive's use of warrantless electronic surveillance, Congress, with the support of the

26   Justice Department, acted in 1978 to establish a regularized procedure for use in the foreign

27   intelligence and counterintelligence field").

28        [4]  *See, e.g., United States v. Abu Jihaad*, 630 F.3d 102 (2d Cir. 2010);  *United States v.*
     *Johnson*, 952 F.2d 565, 572 (1st Cir. 1991);  *United States v. Pelton*, 835 F.2d 1067 (4th Cir.

1    Important differences exist between the standards for a FISA warrant and that issued under the

2  Fourth Amendment and/or Title III of the U.S. Criminal Code.  The "probable cause" required under FISA

3  is merely that the target qualifies as an "agent of a foreign power,"[5] and *not* that a crime has been, or is

4  being, committed, but rather that the "agent of a foreign power" will use the electronic device subject to

5  electronic surveillance, or owns, possesses, uses, or is in the premises to be searched.[6]

6    In that context, FISA establishes procedures for surveillance of foreign intelligence targets,

7  whereby a federal officer acting through the Attorney General may obtain judicial approval for conducting

8  electronic surveillance for foreign intelligence purposes. The FISA statute created a special FISA Court –

9  the Foreign Intelligence Surveillance Court (hereinafter "FISC") – to which the Attorney General must

10  apply for orders approving electronic surveillance of a foreign power, or an agent of a foreign power, for

11  the purpose of obtaining foreign intelligence information.  *See* 50 U.S.C. §§1802(b), 1803 & 1804.[7]

12    Thus, as the Ninth Circuit explained in *United States v. Cavanagh*, 807 F.2d 787 (9th Cir. 1987),

13  "[w]ith important exceptions not pertinent here, FISA requires judicial approval before the government

14  engages in any electronic surveillance for foreign intelligence purposes." *Id*., at 788.  FISA also requires

15  that any application to the FISA Court be made under oath by a federal officer and contain certain

16  information and certifications found in §1804, in summary as follows:

17    (1)  the FISA application must provide the identity of the federal officer making the application.

18         §1804(a)(1);

19    (2)  the FISA application must identify or describe the target. §1804(a)(2);

20    (3)  the FISA application must contain "a statement of the facts and circumstances relied upon

21         by the applicant to justify his belief that . . . the target of the electronic surveillance is a

22         foreign power or an agent of a foreign power and each of the facilities or places at which

23

24  1987);  *United States v. Duggan*, 743 F.2d 59 (2d Cir. 1984);  *United States v. Megahey*, 553 F.
    Supp. 1180 (E.D.N.Y. 1982), *aff'd*, 729 F. 2d 1444 (1983) (Table).

25         [5]  *See* 50 U.S.C. §§1801(b).

26         [6]  *See* 50 U.S.C. §§1805(a)(3) & 1824(a)(3).

27         [7]  The FISC consists of eleven judges (previously seven prior to amendments adopted as
28  part of the The USA PATRIOT Act) who individually hear government applications.  *See* 50
    U.S.C. §1803.

1    the electronic surveillance is directed is being used, or is about to be used by a foreign

2    power or an agent of a foreign power[.]" §1804(a)(3).[8]  *See United States v. Posey*, 864

3    F.2d 1487, 1490 (9th Cir. 1989). FISA defines the term "foreign power," in pertinent part,

4    as "a group engaged in international terrorism or activities in preparation therefor."

5    §1801(a)(4);

6    (4)    the application to the FISC must provide a "statement of the proposed minimization

7    procedures."  §1804(a)(4);

8    (5)    the FISA application must include a "description of the nature of the information sought

9    and the type of communications or activities to be subjected to surveillance."  §1804(a)(5).

10    Thus, FISA appears to require that both the information sought *and* the communications

11    subject to surveillance would have to relate directly to activities involving both an agent of

---

15    [8]    As applicable here, §1801(b) defines "agent of a foreign power" as:

16    (2)    any person who -

17    (A)    knowingly engages in clandestine intelligence gathering activities for or on
18           behalf of a foreign power, which activities involve or may involve a
19           violation of the criminal statutes of the United States;

20    (B)    pursuant to the direction of an intelligence service or network of a foreign
       power, knowingly engages in any other clandestine intelligence activities
21           for or on behalf of such foreign power, which activities involve or are
       about to involve a violation of the criminal statutes of the United States;
22

23    (C)    knowingly engages in sabotage or international terrorism or activities that
       are in preparation therefor, or on behalf of a foreign power;
24

25    (D)    knowingly enters the United States under a false or fraudulent identity for
       or on behalf of a foreign power or, while in the United States, knowingly
26           assumes a false or fraudulent identity for or on behalf of a foreign power;
       or

27

28    (E)    knowingly aids or abets any person in the conduct of activities described in
       subparagraph (A), (B), or (C) or knowingly conspires with any person to
       engage in activities described in subparagraph (A), (B), or (C).

a foreign power and international terrorism as defined in FISA;[9]

(6)    the FISA application must include certain "certifications," enumerated in §1804(a)(6)(A)-(E), and made by designated government officials, that:

    (A)    the certifying official deems the information sought to be foreign intelligence information;

    (B)    the purpose of the surveillance is to obtain foreign intelligence information;

    (C)    such information cannot reasonably be obtained by normal investigative techniques;

    (D)    designates the type of foreign intelligence information being sought according to the categories describe in" §1801(e);  and

    (E)    includes a statement of the basis for the certification that –

        (i)    the information sought is the type of foreign intelligence information designated;  and

        (ii)    such information cannot reasonably be obtained by normal investigative techniques.

---

[9] Section 1801(c) defines "international terrorism" as follows:

(c)    "International terrorism" means activities that –

    (1)    involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or any State;

    (2)    appear to be intended –

        (A)    to intimidate or coerce a civilian population;

        (B)    to influence the policy of a government by intimidation or coercion;  or

        (C)    to affect the conduct of a government by assassination or kidnapping;  and

    (3)    occur totally outside the United States or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to coerce or intimidate, or the locale in which their perpetrators operate or seek asylum.

(7)     the FISA application must contain a statement of the means by which surveillance will be effected and a statement whether physical entry is required to effect the surveillance. §1804(a)(7);

(8)     the FISA application must contain a statement of facts listing all previous related FISA applications made to any FISC judge, and action taken on each previous application. §1804(a)(8);  and

(9)     the FISA application must specify the period of time for which the electronic surveillance is required to be maintained.  §1804(a)(9).

In addition, the Attorney General must personally review the application and determine whether it satisfies the criteria and requirements set forth in FISA.  §1804(d);  *see* §1805(a)(1).

Regarding the judicial component of the FISA process, in considering an application for electronic surveillance pursuant to FISA, the Court should reject the application unless the application meets the following criteria sufficient to permit the Court to make the requisite findings under §1805(a):

(i)     that the application was made by a federal officer and approved by the Attorney General;

(ii)    that there exists probable cause to believe that "the target of the electronic surveillance is a foreign power or an agent of a foreign power . . . and . . . each of the facilities or places at which the electronic surveillance is directed is being used or is about to be used by a foreign power or agent of a foreign power[;]"

(iii)   that the proposed minimization procedures meet the definition of minimization procedures under §1801(h);  and

(iv)    that the application contains all required statements and certifications.

Also, in accordance with §1805(a)(4), if a target is a "United States person,"[10] the FISC must determine whether the "certifications" under §1804(a)(6)(E) – namely that the information sought is "the type of foreign intelligence information designated," and the information "cannot reasonably be obtained by normal investigative techniques" – are "not clearly erroneous."  In addition, §1805(a)(2)(A) provides "that no United States person may be considered a foreign power . . . solely upon the basis of activities

---

[10]  As a naturalized U.S. citizen, Mr. Moalin qualifies as a "United States person" under §1801(i).

1 protected by the first amendment . . .”

2      Orders authorizing FISA wiretaps are issued for certain specified periods of time, but can be

3 extended pursuant to additional applications.  §§1805(d)(1) & (2).  FISA authorizes any “aggrieved

4 person” to move to suppress evidence obtained or derived from an electronic surveillance on the grounds

5 that “the information was unlawfully acquired” or “the surveillance was not made in conformity with an

6 order of authorization or approval.”  §§1806(e)(1) & (2); 1825(f).  FISA defines “aggrieved person” as “a

7 person who is the target of electronic surveillance or any other person whose communications or activities

8 were subject to electronic surveillance.”  §1801(k).

9      FISA permits evidence generated in intelligence investigations to be used in criminal prosecutions.

10 §§1806(b) & 1825(c).  Not a single piece of FISA-generated evidence has ever been suppressed in a

11 criminal prosecution.

12     **2.**   ***Challenges to the Admissibility of FISA-Generated Evidence***

13     **a.**   ***Mr. Moalin Has Standing to Challenge the FISA Surveillance***

14      Here, because Mr. Moalin was a direct target of FISA electronic surveillance – both telephonically

15 and with respect to electronic mail – he is an “aggrieved person” under §1806(k).  Also, as a naturalized

16 U.S. citizen, Mr. Moalin is a “United States person” under FISA, *see* **ante**, at 12 & n. 10, thereby

17 implicating the enhanced standards of review in §1805(a)(4), *see* **ante**, at 12, and the First Amendment

18 protection provided in §1805(a)(2)(A).  *Id.*

19     **b.**   ***Disclosure of the FISA Warrant Applications***

20      Mr. Moalin cannot address any specific content or details of any of the FISA applications in this

21 case because neither he nor his counsel have seen those applications.  While aggrieved criminal defendants

22 can move to suppress FISA-generated evidence, §1806(f) provides that if the Attorney General files an

23 affidavit that “disclosure or an adversary hearing would harm the national security of the United States,”

24 the court deciding the motion must consider the application and order for electronic surveillance *in camera*

25 to determine whether the surveillance was conducted lawfully.

26     As addressed **post**, at 25, FISA adds that

27         [i]n making this determination, the court may disclose to the aggrieved
person, under appropriate security procedures and protective orders, portions
28         of the application, order, or other materials relating to the surveillance only
where such disclosure is necessary to make an accurate determination of the

1  legality of the surveillance.

2  *Id.*

3  Alternatively, §1806(g) provides that "[i]f the court determines that the surveillance was lawfully

4  authorized and conducted, it shall deny the motion of the aggrieved person except to the extent that due

5  process requires discovery or disclosure."  Here, although the defense has not been notified whether the

6  Attorney General has yet submitted an affidavit under §1806(f), it is assumed for purposes of this motion

7  that the government has or will make such a filing.

8  **B.    *Mr. Moalin's Challenges to the FISA Electronic Surveillance In This Case***

9  Given that FISA applications, orders, and related materials have not been disclosed to defense

10  counsel, the grounds for relief set forth below represent defense counsel's best estimation of the

11  deficiencies in the FISA electronic surveillance in this case.  In some respects, the points identify issues

12  for the Court to examine, while in others certain facts that are known contribute to the analysis of

13  particular facets of the FISA process.

14  The lack of access to the underlying FISA materials presents a significant impediment to any

15  defendant's capacity to challenge FISA surveillance with much particularity.  As the Fourth Circuit has

16  recognized in a closely analogous context – discerning what exculpatory evidence a witness solely within

17  the government's control, and to whom the defense is denied access, can provide – when a defendant is

18  deprived of such access, the burden to be specific with respect to the material in question must be relaxed

19  accordingly.  *See United States v. Moussaoui*, 382 F.3d 453, 472 (4th Cir. 2004), *citing United States v.*

20  *Valenzuela-Bernal*, 458 U.S. 858, 870-71, 873 (1982).

21  **1.    *The FISA Applications Failed to Establish the Requisite Probable Cause***

22  **a.    *The Elements of Probable Cause Under FISA***

23  Before authorizing FISA surveillance, the FISA Court must find, *inter alia*, probable cause to

24  believe that "the target of the electronic surveillance is a foreign power or an agent of a foreign power."

25  §1805(a)(2)(A).  The Supreme Court has reiterated the long-standing rule that criminal probable cause

26  requires "a reasonable ground for belief of guilt," and that "the belief of guilt must be particularized with

27  respect to the person to be searched or seized." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).  Under

28  FISA, though, unlike with respect to a traditional warrant, the probable cause standard is directed *not* at

1  the target's alleged commission of a crime, but at the target's alleged status as "a foreign power or an

2  agent of a foreign power."

3             **b.**     ***The "Agent of a Foreign Power" Requirement***

4         Consequently, this Court must initially determine, with respect to each application for FISA

5  electronic surveillance of Mr. Moalin, whether the application established a reasonable, particularized

6  ground for belief that Mr. Moalin qualified as an agent of a foreign power. §§1805(a)(2)(A) &

7  1801(b)(2)(C) & (E).  As set forth **ante**, at n. 8, FISA provides several definitions for an "agent of a

8  foreign power," and multiple definitions for a "foreign power."

9         Here, absent an opportunity to review the applications for any of the wiretaps at issue, defense

10  counsel cannot specify whether the allegations asserting that Mr. Moalin was an "agent of a foreign

11  power" were sufficient to satisfy FISA.  Among FISA's definitions of "agent of a foreign power," that

12  most likely utilized here was that contained in §1801(b)(2)(C):  "any person . . . who *knowingly* engages in

13  sabotage or international terrorism, or activities that are in preparation therefor, for or on behalf of a

14  foreign power."  (Emphasis added).

15         If that provision was, in fact, the basis for the FISA applications, it required evidence establishing

16  probable cause that the defendant or the relevant third-party target *knowingly* engaged in some type of

17  international terrorism – that Mr. Moalin *knew* that his activities were assisting "international terrorism"

18  (defined **ante**, at n. 9).

19             **c.**     ***The Nature and Origins of the Information In the FISA Applications***

20         Again, unlike the case with traditional warrants, non-disclosure of the FISA applications denies the

21  defense the ability to contest the accuracy and/or reliability of the underlying information used to satisfy

22  FISA's version of probable cause.  As a result, absent such disclosure (which is sought **post**, at 24-28),

23  Mr. Moalin can request only that the Court review the FISA  applications cognizant of certain factors and

24  principles.

25             **i.**     ***The Limits of "Raw Intelligence"***

26         For example, foreign intelligence information is often in the form of "raw intelligence," and not

27  vetted in the manner typical of information law enforcement agents supply in ordinary warrant

28  applications, *i.e.*, that the information emanated from a source that was reliable and/or had a verifiable

1  track record, or was independently corroborated.

2      Such raw intelligence is often not attributed to *any* specific source, and its genesis can be multiple-
3  level hearsay, rumor, surmise, and rank speculation.  Also, the motivation driving sources of raw
4  intelligence to impart information is usually not nearly as transparent as in conventional criminal justice
5  circumstances.  As a result, the dangers of deception and disinformation are significantly enhanced.

6      Those limitations on the accuracy and reliability of raw intelligence are aggravated when the
7  potential location – Somalia, a nation afflicted by chaos, and to which the U.S. government has very
8  limited formal access – and context – often military and susceptible to the "fog of war" – reduce the
9  possibility of meaningful corroboration and/or verification.  *See Latif v. Obama*, ___ F.3d ___, 2011 WL
10  5431524, at *21-32 (D.C. Cir. October 14, 2011) (Tatel, J., *dissenting*) (discussing the problems inherent
11  in the "presumption of regularity" accorded government intelligence reports in the context of *habeas*
12  *corpus* petitions filed by Guantanamo Bay detainees).

13                    **ii.      *Illegitimate and/or Illegal Sources of Information***

14      There is also the danger that the information in FISA applications, whether or not attributed to a
15  particular source, was generated by illegal means such as warrantless wiretapping or constitutionally
16  infirm FISA amendments that have yet to be challenged in criminal cases.  In that context, the government
17  should be compelled to disclose whether information in the FISA applications, or which was used to
18  obtain information that appears in the applications, or was used in the investigation in this case in any
19  fashion, originated from such illegitimate means.  *See Gelbard v. United States*, 408 U.S. 41 (1972) (in
20  prosecution for contempt for refusal to testify, grand jury witness entitled to invoke as a defense statutory
21  bar against use of evidence obtained via illegal wiretap as basis for questions in grand jury).

22                    **(A)      *The Warrantless Terrorist Surveillance Program***

23      For example, the government should be required to disclose whether any of Mr. Moalin's
24  communications were intercepted pursuant to the Terrorist Surveillance Program (hereinafter "TSP"), a
25  warrantless wiretapping program instituted in 2001.  *See In re National Security Agency*
26  *Telecommunications Records Litigation (pertaining to:  Al-Haramain Islamic Foundation, Inc. v. Bush)*,
27  451 F. Supp.2d 1215 (D. Ore. 2006), *rev'd and remanded*, 507 F.3d 1190 (9th Cir. 2007), *on remand to*
28  *Northern District of California*, 564 F. Supp.2d 1109 (N.D. Cal. 2008), *after remand*, 700 F. Supp.2d

1  1182 (N.D. Cal. 2010).  *See also ACLU v. National Security Agency*, 438 F. Supp. 2d 754 (E.D. Mich.

2  2006), *rev'd on standing grounds*, 493 F.3d 644 (6th Cir. 2007).  The government should further be

3  compelled to disclose whether any communications intercepted pursuant to the TSP – whether or not Mr.

4  Moalin was a party – contributed to the FISA applications or the search warrant applications (*see* **post**, at

5  POINT II), or to the investigation of this case in any manner.

6                    **(B)**     ***Surveillance Pursuant to the FISA Amendments Act***

7           The Court should also examine whether any portion of the FISA electronic surveillance was

8  requested and conducted pursuant to the authority provided in 50 U.S.C. §1881a, enacted in 2008 as part

9  of the FISA Amendments Act of 2008, Pub. L. No. 110-261 (2008) (hereinafter "FAA"), or whether any

10 information in the FISA applications was the product of surveillance authorized under the FAA.  As noted

11 **ante**, the FISA surveillance of Mr. Moalin's telephone straddles the date of §1881a's enactment, with

12 some occurring in late 2007, and the remainder until December 2008.

13          Congress amended FISA, effective Summer 2008, to allow for the collection of some electronic

14 communications – ostensibly international in character, but which could include a domestic component

15 (*i.e.*, one party within the United States) – without a traditional FISA warrant, but rather on advance court

16 approval of targeting methods rather than designation of a particular target based on individualized

17 probable cause.  *See Amnesty International v. Clapper*, 638 F.3d 118, 124-26 (2d Cir. 2011) (reversing

18 district court's dismissal of complaint on standing grounds), *reh'g denied*, ___F.3d ___, 2011 WL

19 4381737 (2d Cir. September 21, 2011).

20 `          Those new provisions, codified at 50 U.S.C. §1881a, raise constitutional issues different from

21 those implicated by the pre-existing FISA provisions.  The government should not have any legitimate

22 interest in obscuring the authority pursuant to which it conducted FISA surveillance herein;  indeed,

23 refusal by the government to so disclose would  deny Mr. Moalin a fair trial by depriving him of any

24 meaningful opportunity to contest the acquisition and admissibility of evidence that may have been

25 obtained unlawfully.  If any part of the FISA surveillance was conducted pursuant to §1881a, Mr. Moalin

26 intends to move to suppress any  interceptions, and their fruit, on several grounds, including those

27 summarized here:

28          ●      FAA violates several Fourth Amendment principles, including (a)  the prohibition on

1   general warrants;  (b)  the requirement that searches be reasonable;  (c)  the requirement

2   that warrants be issued only upon prior judicial authorization based on an individualized

3   determination of probable cause, and particularizing the place to be searched and the items

4   to be seized;  (d)  the requirement of meaningful, court-supervised minimization;  (e)  the

5   requirement that the electronic surveillance be of limited and precise duration;  and (f)  that

6   the electronic surveillance's primary purpose be to collect foreign intelligence information;

7   ●   FAA surveillance violates the First Amendment because of the chilling effect it has on

8       protected speech and association;  and

9   ●   FAA surveillance violates Article III's separation of powers because FAA requires the

10      judicial branch to issue rulings absent any case or controversy, and to rule on the

11      constitutionality of a government surveillance in the abstract, leaving determination of

12      individualized monitoring exclusively to the Executive branch.

13  *See Amnesty Int'l v. Clapper*, 638 F.3d at 121-22 (describing plaintiffs' claims).

14      Accordingly, the Court should examine the nature, genesis, and provenance of the information in

15  the FISA application, and compel the government to disclose whether any such information was the

16  product of warrantless electronic surveillance (either via the TSP or any other program), or of such

17  surveillance authorized pursuant to the FAA (§1881a).

18              **d.    *FISA's Prohibition On Basing Probable Cause Solely On a
                        "United States Person's" Protected First Amendment Activity***

19      The statute includes an additional restriction for electronic surveillance of a "United States

20  person," as it prohibits finding probable cause for such a target based solely upon First Amendment

21  activities.  In making that probable cause determination, the statute directs "[t]hat no United States person

22  may be considered a foreign power or an agent of a foreign power solely upon the basis of activities

23  protected by the first amendment . . ." §1805(a)(2)(A).

24      Accordingly, if the target participated in First Amendment activities such as expressing support,

25  urging others to express support, gathering information, distributing information, raising money for

26  political causes, or donating money for political causes, these activities cannot serve as a basis for

27  probable cause for a FISA warrant.

28      Here, that limitation on FISA surveillance is relevant because of the information provided in the

                                            -18-                        10-CR-4246 (JM)

1   FIG Assessment.  For example, the FIG Assessment notes that Mr. Moalin had "previously expressed

2   support for al-Shabaab[.]" *See* Exhibit 1, at 1.  *See also* **ante**, at 5.  Such "expression" clearly implicates

3   protected First Amendment conduct.  Also, the FIG Assessment adds that Mr. Moalin "likely supported

4   now deceased senior al-Shabaab leader Aden Hashi Ayrow due to Ayrow's tribal affiliation with the

5   Hawiye tribe/Habr Gedir clan/Ayr subclan rather than his position in al-Shabaab." *Id.*

6          Again, that evaluation does not include an allegation of material support, and the "support"

7   mentioned could very well be limited – especially since the FIG Assessment describes it in benign terms –

8   to protected First Amendment activity.  *See Humanitarian Law Project v. Holder*, ___U.S. ___, 130 S. Ct.

9   2705, 2710 (2010) (material support does not include independent advocacy, or even mere membership in

10  a proscribed organization).

11         Indeed, the Indictment does not allege any material support – in the form of a house and/or

12  financial contributions by Mr. Moalin – to *al Shabaab* until January 2008 (Count 5) and February 2008

13  (*see* Count 3, Overt Act 5, at p. 5), respectively.  That, of course, begs the question whether there was any

14  basis, *other than protected First Amendment activity*, for commencing FISA surveillance on Mr. Moalin.

15  Should the answer be in the negative, the FISA surveillance would be invalid under §1805(a)(2)(A).

16         **2.**      *The FISA Applications May Contain Intentional or Reckless Falsehoods*
               *or Omissions In Contravention of* **Franks v. Delaware***, 438 U.S. 154 (1978)*

17         The Supreme Court's landmark decision in *Franks v. Delaware*, 438 U.S. 154 (1978), established

18  the circumstances under which the target of a search may obtain an evidentiary hearing concerning the

19  veracity of the information set forth in a search warrant affidavit.  As the Court in *Franks* instructed,

20  "where the defendant makes a substantial preliminary showing that a false statement knowingly and

21  intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit,

22  and if the allegedly false statements necessary to the finding of probable cause, the Fourth Amendment

23  requires that a hearing be held at the defendant's request." *Id.* at 156-57.

24         The *Franks* opinion also sets a similar standard for suppression following the evidentiary hearing:

25                 in the event that at that hearing the allegation of perjury or reckless disregard
                   is established by the defendant by a preponderance of the evidence, and,
26                 with the affidavit's false material set to one side, the affidavit's remaining
                   content is insufficient to establish probable cause, the search warrant must
27                 be voided and the fruits of the search excluded to the same extent as if
                   probable cause was lacking on the face of the affidavit.
28

1   *Id.*, at 156;  *see United States v. Blackmon*, 273 F.3d 1204, 1208-10 (9th Cir. 2001) (applying *Franks* to

2   Title III wiretap application);  *United States v. Meling*, 47 F.3d 1546, 1553-56 (9th Cir. 1995) (same);

3   *United States v. Duggan*, 743 F.2d 59, 77 n.6 (2d Cir. 1984) (suggesting that *Franks* applies to FISA

4   applications under Fourth and Fifth Amendments).  *See also United States v. Hammond*. 351 F.3d 765,

5   770-71 (6th Cir. 2003) (applying *Franks* principles).

6       The *Franks* principles apply to omissions as well as to false statements.  *See, e.g., United States v.*

7   *Carpenter,* 360 F.3d 591, 596-97 (6th Cir. 2004);  *United States v. Atkin*, 107 F.3d 1213, 1216-17 (6th Cir.

8   1997).  Omissions will trigger suppression under *Franks* if they are deliberate or reckless, and if the search

9   warrant affidavit, with omitted material added, would not have established probable cause.  *See, e.g. id.*

10       As noted **ante**, without the opportunity to review the applications, Mr. Moalin cannot point to or

11   identify any specific false statements or material omissions in those applications. Although that lack of

12   access prevents defense counsel from making the showing that *Franks* ordinarily requires, *but see* **ante**, at

13   15, counsel notes that the possibility that the government has submitted FISA applications with

14   intentionally or recklessly false statements or material omissions is hardly speculative.

15       For instance, in 2002, in *In re All Matters Submitted to the Foreign Intelligence Surveillance*

16   *Court*, 218 F. Supp. 2d 611, 620-21 (FISC), *rev'd on other grounds sub nom.*, *In re Sealed Case*, 310 F.3d

17   717 (FISCR 2002),[11] the FISC reported that beginning in March 2000, the Department of Justice

18   (hereinafter "DoJ") had come "forward to confess error in some 75 FISA applications related to major

19   terrorist attacks directed against the United States.   The errors related to misstatements and omissions of

20   material facts," including:

21   ●   "75 FISA applications related to major terrorist attacks directed against the United States"

22       contained "misstatements and omissions of material facts." 218 F. Supp. 2d at 620-21;

23   ●   the government's failure to apprise the FISC of the existence and/or status of criminal

24       investigations of the target(s) of FISA surveillance. *Id.*; and

25   ●   improper contacts between criminal and intelligence investigators with respect to certain

26

27       [11] "FISCR" refers to the Foreign Intelligence Court of Review, which is the appellate

28   court for the FISC, and is comprised of three federal Circuit judges.  The FISCR's 2002 decision
     in *In re Sealed Case* marked its first case since enactment of FISA in 1978.

1    FISA applications. *Id.*

2    According to the FISC, "[i]n March of 2001, the government reported similar misstatements in

3    another series of FISA applications . . ." *Id.*, at 621.  Nor were those problems isolated or resolved by

4    those revelations.  Instead, they proved persistent.  A report issued March 8, 2006 by the DoJ Inspector

5    General stated that the FBI found apparent violations of its own wiretapping and other intelligence-

6    gathering procedures more than 100 times in the preceding two years, and problems appear to have grown

7    more frequent in some crucial respects.  *See* Report to Congress on Implementation of Section 1001 of the

8    USA PATRIOT Act, March 8, 2006 (hereinafter "DoJ IG Report"), available at

9    http://www.usdoj.gov/oig/special/s0603/final.pdf.

10    The report characterized some violations as "significant," including wiretaps that were much

11    broader in scope than authorized by a court ("over-collection"), and others that continued for weeks and

12    months longer than authorized ("overruns").  *Id.*, at 24-25.[12]  FISA-related overcollection violations

13    constituted 69% of the reported violations in 2005, an increase from 48% in 2004.  *See* DoJ IG Report, at

14    29.  The total percentage of FISA-related violations rose from 71% to 78% from 2004 to 2005, *id.*, at 29,

15    although the amount of time "over-collection" and "overruns" were permitted to continue before the

16    violations were recognized or corrected decreased from 2004 to 2005.  *Id.*, at 25.

17    Thus, a *Franks* hearing, and disclosure of the underlying FISA materials (*see* **post**, at 24-28), are

18    necessary in order to permit Mr. Moalin the opportunity to prove that the affiants before the FISC

19    intentionally or recklessly made materially false statements and omitted material information from the

20    FISA applications.

21    **3.    *The Collection of Foreign Intelligence Information Was Not a Significant
       Purpose of the FISA Surveillance, and Was Not the Primary Purpose Thereof***

22

23    Concurrent with the investigation of this case was an investigation regarding the *bona fides* of a

24    money-transfer business, or *hawala*, that serviced the Somali community in San Diego. In order to

25    _____

26    [12] The DoJ Inspector General's report was not instigated by the government itself.
       Rather, the publication of documents released to Electronic Privacy Information Center

27    (hereinafter "EPIC") in Freedom of Information Act litigation prompted the DoJ IG to use those
       and other documents as a basis for the report.  In preparing the report the IG reviewed only those

28    108 instances in which the FBI itself reported violations to the Intelligence Oversight Board – a
       four-member Executive Branch body that ordinarily does *not* submit its reports to Congress.

1  determine whether the collection of foreign intelligence information was either a "significant" or the

2  "primary" purpose of the FISA surveillance, or whether that *hawala* criminal investigation motivated the

3  FISA surveillance, the Court should order the government to disclose the FISA applications and related

4  materials to the defense to allow the defense to provide input to the Court regarding these crucial

5  determinations.

6       If the investigation, and purpose of the FISA surveillance, was criminal in nature, all of the

7  evidence derived from the FISA surveillance of Mr. Moalin should be suppressed because the applications

8  failed to adhere to FISA's requirements, or in the alternative to seek appropriate authority under Title III of

9  the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. 99 2510-2520 (1982), rather than

10  under FISA.

11       **4.   *The FISA Applications May Not Have Included the Required Certifications***

12       The Court should review the FISA applications to determine whether they contain all certifications

13  required by §1804(a)(6).  As the Ninth Circuit has declared in the Title III context,  "[t]he procedural steps

14  provided in the Act require 'strict adherence,'" and "utmost scrutiny must be exercised to determine

15  whether wiretap orders conform to [the statutory requirement]." *Blackmon*, 273 F.3d at 1207, *quoting*

16  *United States v. Kalustian*, 529 F.2d 585, 588-9 (9th Cir. 1975).

17       In addition, the Court should examine two certifications with particular care – (i)  that the

18  information sought is "the type of foreign intelligence information designated," and (ii)  that the

19  information "cannot reasonably be obtained by normal investigative techniques."  *See* §1804(a)(6)(E).

20  Particularly if the target of the wiretap is a "United States person" (such as Mr. Moalin), these two

21  certifications must be measured by the "clearly erroneous" standard.  *See* §1805(a)(4).

22       As the Ninth Circuit has observed in relation to the similar provision in Title III, 18 U.S.C. §

23  2518(1)(e), "the necessity requirement 'exists in order to limit the use of wiretaps, which are highly

24  intrusive.'"  *Blackmon*, 273 F.3d at 1207, *quoting United States v. Bennett*, 219 F.3d 1117, 1121 (9th Cir.

25  2000) (internal quotation omitted).  The necessity requirement "ensure[s] that wiretapping is not resorted

26  to in situations where traditional investigative techniques would suffice to expose the [information

27  sought]." *Id.*

28       The Court should also carefully examine the dates, in sequence, of all FISA orders in this case to

1 determine whether there were any lapses of time during which wiretapping continued, or whether any

2 FISA surveillance continued after the FBI's San Diego field office rendered its FIG Assessment regarding

3 Mr. Moalin (Exhibit 1). The statutory scheme contemplates a seamless web: when a FISA order expires

4 and the government wishes to continue the wiretap, the expiring order must be replaced by an extension

5 order, which, in turn, may be obtained only on the basis of a proper FISA application. *See* §1805(d)(1) &

6 (2).

7       FISA surveillance that continues past the expiration date of the FISA order that originally

8 authorized it is just as unauthorized as a wiretap that is initiated without any FISA order at all. Should the

9 Court order the government to disclose the FISA orders in this case to Mr. Moalin's defense counsel, as he

10 requests the Court do, defense counsel will be able to assist the Court in matching up all of the FISA

11 orders by date – an arduous, albeit necessary, task.

12       **5.**     ***The FISA Applications, and the FISA Surveillance, May Not Have Contained or Implemented the Requisite Minimization Procedures***

13

14       In order to obtain a valid FISA order, the government must include in its application a "statement

of the proposed minimization procedures." §1804(a)(4). The purpose of these minimization procedures is

15 to (i) ensure that surveillance is reasonably designed to minimize the acquisition and retention of private

16 information regarding people who are being wiretapped; (ii) prevent dissemination of non-foreign

17 intelligence information; and (iii) prevent the disclosure, use, or retention of information for longer than

18 seventy-two hours unless a longer period is approved by Court order. §1801(h).

19       As FISA involves particularly intrusive electronic surveillance – FISA interception is a "24/7"

20 operation, as the Title III principle of "pertinence" is not applicable; instead, *all* conversations are

21 captured, with minimization occurring later and in other forms – minimization in the FISA context is

22 critically important.

23       A court and commentator have reasoned that [i]n FISA the privacy rights of individuals are

24 ensured not through mandatory disclosure of FISA applications, but

25           through its provisions for in-depth oversight of FISA surveillance *by all*

26           *three branches of government* and by a statutory scheme that to a large degree centers on *an expanded conception of minimization* that differs from

27           that which governs law-enforcement surveillance.

28 *United States v. Belfield*, 692 F.2d 141, 148 & n. 34 (D.C. Cir. 1982) (footnote omitted), *quoting*

1  Schwartz, *Oversight of Minimization Compliance Under the Foreign Intelligence Surveillance Act:  How*

2  *the Watchdogs are Doing Their Job*, 12 RUTGERS L.J. 405, 408 (1981) (emphasis added).

3          Here, the government has provided 1,800 recorded intercepted conversations and hundreds of

4  intercepted e-mails.  It is possible that the FISA application did not contain adequate minimization

5  procedures or, if it did, that those procedures were not followed.  In order to determine whether there were

6  adequate minimization procedures, and that the government complied therewith, defense counsel must be

7  provided with the FISA applications, orders, and related materials.

8  **C.**     ***The Underlying FISA Applications and Other Materials Should Be Disclosed to Defense Counsel to Enable Them to Assist the Court, and On Due Process Grounds***

9

10         **1.**     ***Disclosure of FISA Materials to the Defense Pursuant to §1806(f)***

11         According to FISA's legislative history, disclosure may be "necessary" under §1806(f) "where the

12  court's initial review of the application, order, and fruits of the surveillance indicates that the question of

13  legality may be complicated by factors such as 'indications of possible misrepresentation of fact, vague

14  identification of the persons to be surveilled, or surveillance records which include a significant amount of

15  nonforeign intelligence information, calling into question compliance with the minimization standards

16  contained in the order.'"  *United States v. Belfield*, 692 F.2d 141, 147 (D.C. Cir. 1982) [*quoting* S. Rep.

17  No. 701, 95th Cong., 2d Sess. 64 (1979)];  *see, e.g.*, *United States v. Ott*, 827 F.2d 473, 476 (9th Cir.

18  1987) (same);  *United States v. Duggan*, 743 F.2d 59, 78 (2d Cir. 1984) (same).

19         Here, as discussed **ante**, at 15-19, there are ample justifications for disclosure of the FISA

20  applications, which would permit defense counsel an opportunity to demonstrate that the requisite

21  probable cause with respect to the issue of knowledge was lacking,  that with respect to Mr. Moalin, a

22  "United States person," the alleged "activities" fell within the protection of the First Amendment and,

23  thus, could not be used as a basis for probable cause in any event, and/or that the information in the

24  applications was either unreliable or obtained via illegal means.  Disclosure would also afford defense

25  counsel an opportunity to identify procedural irregularities.

26         In addition, both counsel for Mr. Moalin possess security clearance to at least Top Secret level (and

27  one has been read into more secret programs requiring SCI clearance).  In addition, the Court can  issue an

28  appropriate Protective Order, to which Mr. Moalin's counsel would of course consent, that would provide

elaborate protection for CLASSIFIED information, and which would permit CLASSIFIED materials to be

1  disclosed to defense counsel but not to the defendant(s).  *See* Classified Information Procedures Act

2  (hereinafter "CIPA"), 18 U.S.C. App. III, at §3.

3       Thus, while no court in the more than 25-year history of FISA has ordered disclosure of  FISA

4  applications, orders, or related materials, *see, e.g., In re Grand Jury Proceedings*, 347 F.3d 197, 203 (7th

5  Cir. 2003) (citing cases);  *United States v. Sattar*, 2003 U.S. Dist. LEXIS 16164, at *19 (S.D.N.Y. Sept.

6  15, 2003) (same), the circumstances herein compel disclosure.  Indeed, the existence of §1806(f) is an

7  unambiguous declaration that Congress intended for courts to grant disclosure in appropriate cases.  If

8  §1806(f) is to be rendered meaningful at all, and not be rendered superfluous and entirely inert, it should

9  apply in this case.

10       **2.    *Disclosure of FISA Materials to the Defense Pursuant to §1806(g)***

11       Even if the Court were to decline to find that disclosure of FISA-related materials to the defense is

12  appropriate under §1806(f), the defense would still be entitled to disclosure of the FISA applications,

13  orders, and related materials under §1806(g), which expressly incorporates  the Fifth Amendment Due

14  Process Clause, and provides that "[i]f the court determines that the surveillance was lawfully authorized

15  and conducted, it shall deny the motion of the aggrieved person *except to the extent that due process*

16  *requires discovery or disclosure*."  50 U.S.C. §1806(g) (emphasis added).  *See also United States v.*

17  *Spanjol*, 720 F. Supp. 55, 57 (E.D. Pa. 1989) ("[u]nder FISA, defendants are permitted discovery of

18  materials only to the extent required by due process.  That has been interpreted as requiring production of

19  materials mandated by [*Brady*], essentially exculpatory materials").

20       **3.    Ex Parte *Proceedings Are Antithetical to the Adversary System of Justice***

21       Lack of disclosure would render the proceedings on the validity of the FISA electronic surveillance

22  *ex parte*, as the challenges on Mr. Moalin's behalf would be made without access to documents and

23  information essential to the determination of his motion.  Such proceedings are antithetical to the

24  adversary system that is the hallmark of American criminal justice.

25       *Ex parte* proceedings impair the integrity of the adversary process and the criminal justice system.

26  As the Supreme Court has recognized, "'[f]airness can rarely be obtained by secret, one-sided

27  determination of facts decisive of rights. . . .  No better instrument has been devised for arriving at truth

28  than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it.'"

1  *United States v. James Daniel Good Real Property, et. al.*, 510 U.S. 43, at 55 (1993) (*quoting Joint Anti-*

2  *Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 170-72 (1951) (Frankfurter, J., *concurring*).  *See*

3  *also United States v. Madori*, 419  F.3d 159, 171 (2d Cir. 2005), *citing United States v. Arroyo-Angulo*,

4  580 F.2d at 1145 (closed proceedings "are fraught with the potential of abuse and, absent compelling

5  necessity, must be avoided") (other citations omitted).[13]

6       In *United States v. Abuhamra*, 389 F.3d 309 (2d Cir. 2004), the Second Circuit reemphasized the

7  importance of open, adversary proceedings, declaring that "[p]articularly where liberty is at stake, due

8  process demands that the individual and the government each be afforded the opportunity not only to

9  advance their respective positions but to correct or contradict arguments or evidence offered by the other."

10  389 F.3d at 322-23 [*citing McGrath*, 341 U.S. at 171 n. 17 (Frankfurter, J., *concurring*), which noted that

11  "the duty lying upon every one who decides anything to act in good faith and fairly listen to both sides . . .

12  always giving a fair opportunity to those who are parties in the controversy for correcting or contradicting

13  any relevant statement prejudicial to their view") (citation and internal quotation marks omitted).

14       As the Ninth Circuit observed in the closely analogous context of a secret evidence case, "'[o]ne

15  would be hard pressed to design a procedure more likely to result in erroneous deprivations.' . . .  [T]he

16  very foundation of the adversary process assumes that use of undisclosed information will violate due

17  process because of the risk of error." *American-Arab Anti-Discrimination Committee v. Reno*, 70 F.3d

18  1045, 1069 (9th Cir. 1995) (*quoting* District Court); *see, e.g., id.* at 1070 (noting "enormous risk of error"

19  in use of secret evidence); *Kiareldeen v. Reno*, 71 F. Supp. 2d 402, 412-14 (Dist. N.J. 1999) (same).

20       Similarly, in the Fourth Amendment context, including in relationship to electronic surveillance,

21  the Supreme Court has twice rejected the use of *ex parte* proceedings on grounds that apply equally here.

22  In *Alderman v. United States*, 394 U.S. 165 (1969), the Court addressed the procedures to be followed in

23  determining whether government eavesdropping in violation of the Fourth Amendment contributed to the

24  prosecution case against the defendants.  The Court rejected the government's suggestion that the district

25  court make that determination *in camera* and/or *ex parte*.

26  ——————————

27      [13] Conversely, as Judge Learned Hand said in *United States v. Coplon,* 185 F.2d 629, 638 (2d Cir. 1950), *cert. denied*, 342 U.S. 920 (1952), "[f]ew weapons in the arsenal of freedom are

28  more useful than the power to compel a government to disclose the evidence on which is seeks to forfeit the liberty of its citizens."

The Court observed that

> [a]n apparently innocent phrase, a chance remark, a reference to what appears to be a neutral person or event, the identity of a caller or the individual on the other end of a telephone, or even the manner of speaking or using words may have special significance to one who knows the more intimate facts of an accused's life.  And yet that information may be wholly colorless and devoid of meaning to one less well acquainted with all relevant circumstances.

*Id*. at 182.

In ordering disclosure of improperly recorded conversations, the Court declared:

> [a]dversary proceedings will not magically eliminate all error, but they will substantially reduce its incidence by guarding against the possibility that the trial judge, through lack of time or unfamiliarity with the information contained in and suggested by the materials, will be unable to provide the scrutiny that the Fourth Amendment exclusionary rule demands.

*Id*. at 184.

Likewise, the Court held in *Franks v. Delaware*, 438 U.S. 154 (1978), that a defendant, upon a preliminary showing of an intentional or reckless material falsehood in an affidavit underlying a search warrant, must be permitted to attack the veracity of that affidavit.  The Court rested its decision in significant part on the inherent inadequacies of the *ex parte* nature of the procedure for issuing a search warrant, and the contrasting enhanced value of adversarial proceedings:

> the hearing before the magistrate [when the warrant is issued] not always will suffice to discourage lawless or reckless misconduct.  The pre-search proceeding is necessarily *ex parte*, since the subject of the search cannot be tipped off to the application for a warrant lest he destroy or remove evidence.  The usual reliance of our legal system on adversary proceedings itself should be an indication that an *ex parte* inquiry is likely to be less vigorous.  The magistrate has no acquaintance with the information that may contradict the good faith and reasonable basis of the affiant's allegations. The pre-search proceeding will frequently be marked by haste, because of the understandable desire to act before the evidence disappears; this urgency will not always permit the magistrate to make an independent examination of the affiant or other witnesses.

438 U.S. at 169.

The same considerations that the Supreme Court found compelling in *Alderman* and *Franks* militate against *ex parte* procedures in the FISA context.  Indeed, the lack of any authentic adversary proceedings in FISA ligitation more than likely accounts for the government's perfect record in defending FISA and FISA-generated evidence.  After all, denying an adversary access to the facts constitutes an advantage as powerful and insurmountable as exists in litigation.

1    As the FISC itself has acknowledged, for example, without adversarial proceedings, systematic

2  executive branch misconduct – including submission of FISA applications with "erroneous statements"

3  and "omissions of material facts" – went entirely undetected by the courts until the FISC directed that the

4  Department of Justice review FISA applications and submit a report to the FISC.  *See In re All Matters*

5  *Submitted to the Foreign Intelligence Surveillance Court*, 218 F. Supp.2d at 620-21 , *rev'd on other*

6  *grounds*, 310 F.3d 717 (FISCR 2002).  *See also* **ante**, at 19-20.

7    However, as discussed above, the complete deference now required of the courts toward the

8  executive with respect to FISA renders any such "in-depth oversight" and "expanded conception of

9  minimization" (relied upon in *Belfield*, 692 F.2d at 148 & n. 34;  *see also* **ante**, at 15) entirely illusory.  As

10  a result, §§1806(f) & (g), and the disclosure they authorize, assume significantly greater meaning and

11  importance in evaluating the validity of FISA applications.  Also, as noted **ante**, Mr. Moalin's counsel

12  possess the requisite security clearance to view the material, thereby further eliminating any justification

13  for non-disclosure, or any claim that such limited, safe disclosure presents any danger to national security.

14    Moreover, the Court's review *in camera* is not a substitute for defense counsel's participation.  As

15  the Supreme Court recognized in *Alderman*, "[i]n our adversary system, it is enough for judges to judge.

16  The determination of what may be useful to the defense can properly and effectively be made only by an

17  advocate."   394 U.S. at 184;  *see also Franks v. Delaware*, 438 U.S. 154, 169 (1978) (permitting

18  adversarial proceeding on showing of intentional falsehood in warrant affidavit because the magistrate

19  who approves a warrant *ex parte* "has no acquaintance with the information that may contradict the good

20  faith and reasonable basis of the affiant's allegations").[14]

21

---

22    [14]  As the District Court in *United States v. Marzook*, 412 F. Supp.2d 913 (N.D. Ill. 2006),

23  explained in the context of deciding whether to close a suppression hearing to the public because
of the potential revelation of classified information threat,

24

25    [i]t is a matter of conjecture whether the court performs any real
judicial function when it reviews classified documents in camera.

26    Without the illumination provided by adversarial challenge and
with no expertness in the field of national security, the court has no

27    basis on which to test the accuracy of the government's claims.

28  Id., at 921, *quoting Stein v. Department of Justice & Federal Bureau of Investigation*, 662 F.2d
1245, 1259 (7th Cir. 1981).

1  Accordingly, either under §1806(f), §1806(g), and/or the Due Process clause, disclosure of the

2 FISA materials is authorized and appropriate in this case.

3                                                **POINT II**

4                          **ANY EVIDENCE RECOVERED PURSUANT
                            TO THE SEARCH WARRANT EXECUTED**
5                          **AT MR. MOALIN'S RESIDENCE SHOULD
                            BE SUPPRESSED BECAUSE THE INFORMATION**
6                          **IN THE WARRANT APPLICATION WAS STALE**

7        Mr. Moalin moves to suppress all evidence seized pursuant to the November 1, 2010, search of his

8 residence, located at 3810 Winona Avenue #116, San Diego, California.  As set forth below, the warrant

9 was not based on probable cause because the information in the warrant application was stale, with the

10 most recent fact related to Mr. Moalin occurring nearly *two years* before the application was submitted.

11 As a result, the evidence seized pursuant to the search, and any fruits thereof, must be suppressed.

12       Although the search of Mr. Moalin's residence was reasonable in scope, and in the manner in

13 which it was conducted, the seized evidence must still be precluded because the search warrant was based

14 on less than probable cause.  The search warrant application sets forth facts which, if true, may have been

15 sufficient to establish probable cause to search Mr. Moalin's home in December 2008.  However, that

16 information was stale, and did not establish probable cause to search Mr. Moalin's home on November 1,

17 2010, nearly *two years* after the last fact set forth in the application.

18 **A.**   ***Statement of Facts***

19       At 9:30 a.m., November 1, 2010, after Mr. Moalin had been arrested, 19 federal agents arrived at

20 3810 Winona Avenue, Apt. #116.  *See* FBI 302, dated November 2, 2010 ( a copy of which is attached as

21 Exhibit 4, to the Dratel Dec.).  The officers entered through a window, and conducted a full search of Mr.

22 Moalin's home.  *Id.*  The search of Mr. Moalin's residence resulted in the seizure of numerous documents

23 and other evidence, including telephones, computer equipment, and bank statements.  *Id.*

24       The search was conducted pursuant to a search warrant issued October 29, 2010, by United States

25 Magistrate Judge Jan M. Adler.  The application, a copy of which is attached as Exhibit 5 to the Dratel

26 Dec., sets forth various facts, ranging from the history of Somalia to Mr. Moalin's alleged transfer of funds

27 to Somalia, and including the following allegations relevant to this motion:

28       ●    the U.S. Department of State designated *al Shabaab* as a Foreign Terrorist Organization

("FTO") and Specially Designated Global Terrorist (SDGT) February 26, 2008, thereby

making it unlawful, for the first time, to offer material support to *al Shabaab*;

- Mr. Moalin allegedly transferred $3,000.00 to Aden Ayrow, the leader of *al Shabaab*, April 23, 2008;

- Aden Ayrow was killed May 1, 2008;

- Mr. Moalin allegedly was in direct telephone contact with Aden Ayrow until his death;

- money was transferred July 15, 2008, to a recipient known as "Farah Yare;"

- money was transferred July 18, 2008, to Omar Mattan;

- Somalia does not have a central banking system, and therefore money must be transferred through *Hawalas*;

- Mr. Moalin utilized a *Hawala*, specifically Shidaal Express, located in San Diego, to transfer money;

- Shidaal Express records are in the possession of the government, and were available to the government prior to seeking the search warrant for Mr. Moalin's residence;

- Mr. Moalin traveled to Somalia during December 2008;

- through December, 2008, Mr. Moalin expressed support for the struggle against the Ethiopian invasion of Somalia;

- in 2008 the FBI conducted periodic visual surveillance of Mr. Moalin;  and

- Mr. Moalin's lease on the apartment to be searched began May 20, 2010, and was to expire November 30, 2010.

*See* Exhibit 5.

The search warrant application did not contain any facts pertaining to the period between December 2008, and October 29, 2010.

**B.    *The Facts Supporting the Search Warrant Are Stale,
and Therefore Do Not Constitute Probable Cause***

The Fourth Amendment protects against "unreasonable searches and seizures" and demands that all warrants shall issue only upon probable cause.  *U.S. Const., amend IV.*  As the Supreme Court has declared, "[i]n enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the [Supreme] Court has insisted upon probable cause as a minimum requirement for a reasonable search

1   permitted by the Constitution." *Chambers v. Maroney*, 399 U.S. 42, 51 (1970).

2       Moreover, "'the substance of all the definitions' of probable cause 'is a reasonable ground for

3   belief of guilt.'"  *Brinegar v. United States*, 338 U.S. 160, 175 (1949), *quoting McCarthy v. Dearmit*, 99

4   Pa. 63, 69, (S.C. PA 1881).  As the Supreme Court has explained, "the traditional standard for review of

5   an issuing magistrate's probable cause determination has been that so long as the magistrate had a

6   'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth

7   Amendment requires no more." *Illinois v. Gates*, 462 U.S. 213, 236 (1983), *quoting Jones v. United*

8   *States*, 362 U.S. 257, 271 (1960).

9       Pursuant to *Gates*, a probable cause determination must be reviewed using the "totality of the

10  circumstances test."  *Gates*, 462 U.S. at 241. In the event evidence is recovered pursuant to an unlawful

11  search, or as a consequence of same, the Supreme Court established long ago that such evidence is

12  inadmissible as tainted fruit of that illegality.  *Wong Sun v. United States*, 83 U.S. 471 (1963).

13      Probable cause exists to support the issuance of a warrant if "the facts [are] sufficient to justify a

14  conclusion that the property which is the object of the search is probably on the premises to be searched at

15  the time the warrant is issued." *United States v. Greany*, 929 F.2d 523, 524-25 (9th Cir. 1991), *citing*

16  *United States v. Hendricks,* 743 F.2d 653, 654 (9th Cir.1984).

17      Whether the information in the application is stale "must be evaluated in light of the particular

18  facts of the case and the nature of the criminal activity and property sought." *Greany*, 929 F.2d at 525,

19  *citing United States v. Foster,* 711 F.2d 871, 878 (9th Cir.1983).  As the Second Circuit has pointed out,

20  "[a]lthough many factors will have some relevance, . . . the principal factors in assessing whether or not

21  the supporting facts have become stale are the age of those facts and the nature of the conduct alleged to

22  have violated the law." *United States v. Martino*, 664 F.2d 860, 867 (2d Cir. 1981).

23      Here, the information provided in the application relates to conduct by Mr. Moalin and

24  observations by government agents occurring nearly two years prior to the search of Mr. Moalin's

25  residence.  Coupled with the fact that Mr. Moalin's lease on the apartment that was searched began 18

26  months *after* the last fact set forth in the application, the information in the application was clearly stale.

27      The charges in this case all stem from Mr. Moalin's alleged financial support of *al Shabaab*.  The

28  last financial transaction set forth in the search warrant application occurred July, 2008.  The application

1 alleges that afterward Mr. Moalin traveled to Somalia in December 2008.  The only stated connection

2 between Mr. Moalin's acts in 2008 and the October 29, 2010, application to search his home, is the

3 agents' "belief that there is probable cause to believe that Moalin would continue to keep the items[.]" *See*

4 Search Warrant Application, at 26, ¶ 64 (Exhibit 5).  In support of that contention, the application notes

5 merely that the "fighting in Somalia continues to this day[.]" *Id.*, at 27, ¶ 64.

6      The lack of a temporal connection between the search warrant application and the search of Mr.

7 Moalin's home is highlighted by the fact that the FBI conducted physical surveillance of Mr. Moalin's

8 home only in 2008.  During 2008, it was noted that Mr. Moalin's routine was driving a taxi during the day

9 and, after his shift concluded, returning to his *former* apartment.  *Id.*, at 27, ¶ 65 (emphasis added).  Mr.

10 Moalin moved to 3810 Winona Avenue, Apt. #116, May 20, 2010, approximately 18 months *after* the

11 physical surveillance of him had concluded.  Thus, there is nothing in the search warrant application that

12 connects the premises searched to any of the facts alleged in the search warrant application.

13      In addition, the search warrant application does not provide probable cause to believe that the

14 documents and evidence sought via the warrant would be at the premises at the time of the search.

15 Accordingly, Mr. Moalin respectfully moves this Court for suppression of all documents and other

16 tangible evidence seized pursuant to the November 10, 2010, search executed at 3810 Winona Avenue,

17 Apt. #116, San Diego, California.  *See Segura v. U.S.*, 468 U.S. 796, 804 (1984) ("[e]vidence obtained as a

18 direct result of an unconstitutional search or seizure is plainly subject to exclusion").

**POINT III**

**MR. MOALIN'S POST-ARREST, POST-
INDICTMENT STATEMENT MUST BE
SUPPRESSED BECAUSE IT WAS
OBTAINED IN VIOLATION OF HIS
SIXTH AMENDMENT RIGHT TO COUNSEL**

23      Mr. Moalin moves for suppression of his October 31, 2010, post-arrest, post-indictment statement

24 that was elicited from him in violation of his rights under Sixth Amendment to the United States

25 Constitution because he was not informed that he had already indicted.  The Indictment against Mr.

26 Moalin had been filed October 22, 2010.  Yet nine days later, October 31, 2010, Mr. Moalin was detained

27 at the San Diego International Airport, arrested by members of the FBI, and questioned extensively.  Prior

28 to questioning Mr. Moalin, the agents did not inform Mr. Moalin he had already been indicted in this case.

1    Indeed, the agents did nothing more than read him *Miranda* warnings three hours prior to questioning

2    him.[15]

3            In this context, the Supreme Court has declared that

4                [u]nder our precedents, once the adversary judicial process has been
                initiated, the Sixth Amendment guarantees a defendant the right to have
5                counsel present at all "critical" stages of the criminal proceedings.  *United
                States v. Wade,* 388 U.S. 218, 227-228 (1967);  *Powell v. Alabama,* 287 U.S.
6                45, 57 (1932).  Interrogation by the State is such a stage.  *Massiah v. United
                States,* 377 U.S. 201, 204-205 (1964);  *see also United States v. Henry,* 447
7                U.S. 264, 274 (1980).

8    *Montejo v. Louisiana*, 556 U.S. 778, 129 S. Ct. 2079, 2085 (2009), *reh'g denied*, 130 S. Ct. 23 (U.S.

9    2009).

10           In *United States v. Massiah*, 377 U.S. 201 (1964), the Supreme Court held that the accused "was

11   denied the basic protections of the [Sixth Amendment] guarantee when there was used against him at trial

12   evidence of his own incriminating words, which federal agents had deliberately elicited from him after he

13   had been indicted and in the absence of counsel."  377 U.S. at 205-6.  Significantly, the Supreme Court

14   explained, that there were a variety of situations which could constitute such a denial, and that "if such a

15   rule is to have any efficacy it must apply to indirect and surreptitious interrogations as well as those

16   conducted in the jailhouse."  *Id.* at 206.

17           In the wake of *Massiah*, district courts sought to integrate the rules of *Massiah* and *Miranda* to

18   determine if the rights set forth in *Massiah* could be waived.  In one such decision, *United States v.*

19   *Satterfield*, 417 F.Supp. 293 (S.D.N.Y. 1976), the District Court established the rule that a post-indictment

20   waiver of counsel was only valid "after such warnings and explanations as would justify a court in

21   permitting a defendant to proceed *pro se* at trial."  *Id.*, at 296.  Relying on *Massiah*, the Ninth Circuit has

22   stated that, "[t]his Sixth Amendment right is violated whenever an agent of the Government deliberately

23   elicits incriminating statements from an indicted defendant in the absence of counsel."  *United States v.*

24   *Kimball*, 884 F.2d 1274, 1278 (9th Cir. 1989).

25   _____

26       [15] Mr. Moalin signed the written *Miranda* waiver form at 7:30 a.m. on October 31, 2010,
     and was questioned at 10:30 a.m. by federal agents.  At this time, Mr. Moalin does not raise a
27   Fifth Amendment violation.  However, should additional facts become known about the
     circumstances of his signing the *Miranda* waiver, or the three hour interim between signing the
28   waiver and being questioned that tend to establish a Fifth Amendment violation, Mr. Moalin
     reserves the right to make further motions.

1    The Supreme Court, in *Patterson v. Illinois*, 487 U.S. 285, 300 (1988), later restricted the holding

2    in *Massiah*, stating that a waiver of the right to counsel was sufficient in the Sixth Amendment context,

3    "[s]o long as the accused is made aware of the 'dangers and disadvantages of self-representation'[.]"   The

4    Court, noted, however, that "[t]his does not mean, of course, that all Sixth Amendment challenges to the

5    conduct of postindictment questioning will fail whenever the challenged practice would pass constitutional

6    muster under *Miranda*." *Id.*, at 297, n. 9.

7    The Supreme Court specifically *declined* to address whether the accused must be informed by the

8    police about the indictment in order to effectuate a valid waiver of the right to counsel for purposes of a

9    post-indictment interrogation. *Id.,* at 295, n.8.  As the Court noted, "we do not address the question

10   whether or not an accused must be told that he has been indicted before a postindictment Sixth

11   Amendment waiver will be valid." *Id.*

12   Here, Mr. Moalin was not informed that an indictment had been filed.  Instead he was detained at

13   the airport, as was often the case when he returned from abroad,[16] and questioned by federal agents.  The

14   *Miranda* warnings had been read to Mr. Moalin three hours prior to his interrogation.  During the video-

15   taped interrogation, Mr. Moalin was reminded that his rights applied, but the agent did nothing more to

16   insure that Mr. Moalin understood that this airport interview was any different from those that he had

17   previously faced.  He was not informed that an Indictment against him had been filed.

18   Accordingly, in those circumstances, Mr. Moalin's Sixth Amendment right to counsel was

19   violated.  Mr. Moalin therefore respectfully requests that this Court suppress his October 31, 2010, post-

20   arrest, post-indictment statement.

21                                            **POINT IV**

22                          **THE GOVERNMENT SHOULD BE COMPELLED**
                            **TO PRODUCE EXCULPATORY MATERIAL AND**
23                          **INFORMATION REFERRED TO IN THE FIG ASSESSMENT**

24   The FIG Assessment (Exhibit 1) establishes that exculpatory material and information that exists

25   has not yet been produced to the defense, but which must be provided pursuant to *Brady v. Maryland*, 373

26   U.S. 83 (1963).  The FIG Assessment was prepared "to document San Diego FIG [Field Intelligence

27   Group] assessment of Basaaly Moalin's motivation for providing financial support to al-Shabaab circa

28

[16] *See* FBI Report, dated February 24, 2009, attached to Dratel Dec., as Exhibit 6.

1    April, 2009." *See* Exhibit 1.

2        The FIG Assessment reports that "[o]n 4/23/2009, as per *the referenced document*, the San Diego

3    Field Intelligence Group (FIG) provided the following assessment of Basaaly Moalin's possible

4    motivation for providing financial support to al-Shabaab in Somalia[.]" *Id.* (emphasis added).  Thus, the

5    FIG Assessment itself refers to another document that contains information related to that in the FIG

6    Assessment.  That document must be produced.

7        Also, the FIG Assessment notes, *inter alia*, that:

8    ●    [a]lthough Moalin has previously expressed support for al-Shabaab, *he is likely more*

9         *attentive to Ayr subclan issues and is not ideologically driven to support al-Shabaab. Id.*

10        (emphasis added);

11   ●    [t]he San Deigo FIG assesses that Moalin likely supported now deceased senior al-Shabaab

12        leader Aden Hashi Ayrow *due to Ayrow's tribal affiliation with the Hawiye tribe/Habr*

13        *Gedir clan/Ayr subclan rather than his position in al-Shabaab.  Id.* (emphasis added);  and

14   ●    "*Moalin has also worked diligently to support Ayr issues to promote his own status with*

15        *Habr Gedir elders.*"  *Id.* (emphasis added).

16       The italicized portions unmistakably constitute *Brady* material, and require the government to

17   produce the following material and information relating to and underlying those portions:

18        (1)    any and all witnesses whose statements provided the basis for the italicized

19               conclusions;

20        (2)    any and all reports (however memorialized or stored) containing information or

21               facts forming the basis for the italicized conclusions;

22        (3)    any and all records and/or other documents (however memorialized or stored)

23               containing information or facts forming the basis for the italicized conclusions;

24        (4)    internal reports, memoranda, and/or analyses containing information, facts, or

25               analysis forming the basis for the italicized conclusions;  and

26        (5)    surveillance materials – whether visual, audio, or otherwise (however created or

27               stored) – containing information or facts forming the basis for the italicized

28               conclusions.

1    The government should also be compelled to produce information, reports, memoranda, and/or

2 other materials reflecting whether the investigation against Mr. Moalin was at some point suspended,

3 closed, or otherwise de-activated, and the reasons for such action.

4                                            **POINT V**

5                          **MR. MOALIN RESPECTFULLY JOINS IN**
                           **THOSE MOTIONS BY HIS CO-DEFENDANTS**
6                          **THAT INURE TO MR. MOALIN'S BENEFIT**

7    In particular, Mr. Moalin joins in the Request for a Bill of Particulars filed by defendant Issah

8 Doreh.

9                                            **POINT VI**

10                     **REQUEST FOR LEAVE TO FILE FURTHER MOTIONS**

11    Mr. Moalin has received a substantial amount of discovery.  However, as new information comes

12 to light, due to the government providing additional discovery in response to these motions, or an order of

13 this Court, the defense may find it necessary to file further motions.  Therefore, it is requested that defense

14 counsel be allowed the opportunity to file further motions based upon information gained through the

15 discovery process, or subsequent developments in the case.

16                                         **CONCLUSION**

17    Accordingly, for the foregoing reasons, Mr. Moalin respectfully requests that the Court grant the

18 above motions in their entirety.

19 Dated: 9 December 2011
        New York, New York                          Respectfully submitted,

20

21                                                   S/Joshua L. Dratel
                                                    Joshua L. Dratel
22                                                  DRATEL & MYSLIWIEC, P.C.
                                                    2 Wall Street, 3rd Floor
23    – Of Counsel –                                New York, New York 10005
     Joshua L. Dratel                               (212) 732-0707
24   Alice L. Fontier                               jdratel@dratelmys.com

25                                                  *Attorneys for Defendant Basaaly Moalin*

26 To:   THE HON. JEFFREY T. MILLER
         UNITED STATES DISTRICT JUDGE
27
       WILLIAM COLE
28     CAROLINE HAN
       ASSISTANT UNITED STATES ATTORNEYS