## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Michael C. Kaiser, being duly sworn, depose and state:

1.  I am a Special Agent with the Federal Bureau of Investigation (FBI), assigned to the San Diego Division. I have been so employed since October 19, 2003. Since June 2007, I have been assigned to investigate counterterrorism matters, including criminal violations relating to providing material support to terrorists and designated Foreign Terrorist Organizations (FTOs), conspiracy to kill or maim persons in foreign countries, and money laundering.

2.  This Affidavit is made in support of an application by the United States of America for a warrant to search the home of Basaaly Saeed Moalin AKA Muse Shekhnor Roble ("MOALIN"), located at 3810 Winona Avenue, #116, San Diego, California, as further described in Attachment A, for evidence of violations of Title 18, United States Code, Section 2339A(a) (material support to terrorists); Title 18, United States Code, Section 2339B (material support to foreign terrorist organization); Title 18, United States Code, Section 956 (conspiracy to kill persons in a foreign country); and Title 18, United States Code, Section 1956(h) (conspiracy to commit money laundering), as described in Attachment B.

3.  The facts set forth in this Affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers and linguists, and review of public, commercial, and law enforcement records and reports.

4.  Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this

investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of the aforementioned offenses is located on the premises described in Attachment A. Where statements of others are set forth in this Affidavit, they are set forth in substance and in part. Foreign language statements are set forth based on translations by FBI language specialists, which are subject to further review or refinement. Certain foreign language words and names are spelled phonetically and, therefore, with some variation by the language specialists.

5.      The investigation has revealed that MOALIN and others have coordinated the transfer of funds to support al-Shabaab, a violent extremist group operating in Somalia that has been designated by the U.S. Secretary of State as a Foreign Terrorist Organization (FTO) and a Specially Designated Global Terrorist (SDGT). The funds were transferred from the United States to Somalia via Shidaal Express, a money remitting business that operated through an informal money transfer system called a "hawala."

## BACKGROUND

### A.      Background on Somalia

6.      For more than fifteen years, Somalia has lacked a stable government and has been vulnerable to intense civil and sectarian violence. In 2004, the Transitional Federal Government (TFG) was established under international auspices. A loose coalition of Islamic insurgents known as the Islamic Courts Union (or Council of Islamic Courts) (ICU) fought against the TFG, however, and took control over much of southern Somalia. In early June 2006, the ICU captured Somalia's capital city Mogadishu, and the TFG retreated to Baidoa, Somalia. The ICU, together with an extremist faction known as al-Shabaab, continued to fight the TFG in Baidoa. While in

2

control of southern Somalia, the ICU and al-Shabaab are believed to have provided protection and safe haven for al-Qaeda operatives wanted for the 1998 bombings of the United States embassies in Kenya and Tanzania and a 2002 hotel bombing in Kenya.

7.      In late 2006, Ethiopian forces intervened on the TFG's behalf, routed the ICU and recaptured Mogadishu. With Ethiopian and African Union support, the TFG was reinstalled into power. Although it initially dispersed in the face of the Ethiopian invasion, al-Shabaab eventually regrouped and initiated a war in Somalia targeting all aspects of the TFG, including police stations, border posts, government facilities and civilian targets, as well as the TFG's Ethiopian and African Union supporters. Al-Shabaab captured several cities and towns in southern Somalia, including parts of Mogadishu itself. In addition to fighting against the TFG, al-Shabaab also opposed two autonomous regions of northern Somalia known as Puntland and Somaliland. In late 2008 and early 2009, Ethiopia began to withdraw its troops from Somalia, and al-Shabaab advanced against the TFG. In late January 2009, al-Shabaab captured Baidoa, and TFG control was reduced to several square blocks in Mogadishu protected by African Union peacekeepers.

8.      Throughout its war against the TFG and its Ethiopian and African Union[1] supporters, al-Shabaab has used harassment and targeted assassinations of civilians and journalists, improvised explosive devices, rockets, mortars, automatic weapons and general tactics of intimidation and violence to undermine the Somali government, quell the Somali population, and force the withdrawal of foreign troops. Al-Shabaab has claimed responsibility

---

[1] The African Union has deployed forces from Uganda and Burundi to Somalia to act as peacekeepers.

for multiple suicide bombing attacks, including an attack on Burundian peacekeepers in Mogadishu on April 8, 2008; five simultaneous suicide bombings targeting TFG, Ethiopian and United Nations facilities in Puntland and Somaliland on October 29, 2008; and another suicide attack against Burundian peacekeepers on February 22, 2009. Al-Shabaab has declared that its ultimate goal is the imposition of Sharia (strict Islamic law) throughout Somalia.

        9.     Al-Shabaab's former leader, Aden Hashi Ayrow, called for foreign fighters to join al-Shabaab in a "holy war" against the Ethiopian and other African forces in Somalia. Ayrow's call was echoed by al-Qaeda leadership, including Usama bin Laden and Ayman al-Zawahiri, and fighters from other countries – including the United States – have traveled to Somalia to engage in violent jihad.

        10.    On or about February 26, 2008, the U.S. Department of State designated "Al-Shabaab" as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act, as amended, and as a Specially Designated Global Terrorist (SDGT) under Section 1(b) of Executive Order 13224, as amended. The designation remains in effect as of this date. Under the designation, al-Shabaab is also known as (a/k/a) al-Shabab, Shabaab, Mujahidin al-Shabaab Movement, Mujahidin, MYM, Harakat Shabab al-Mujahidin, Hizbul Shabaab, Hisb'ul Shabaab, al-Shabaab al-Islamiya, al Shabaab al-Islaam, al-Shabaab al-Jihaad. "Al-Shabaab" is an Arabic word that loosely translates to "the Youth" and is used commonly in the Somali language. Thus, al-Shabaab and its members and affiliates are commonly referred to, and known as: "the Youth," "the young ones," "the young men," "the youngsters," "the orphans" "the Youth Movement," "the Youth Wing", and "the Unity of Islamic Youth."

        11.    When the State Department designated al-Shabaab as an FTO, the press releases

4

specifically identified Aden Ayrow as an al-Shabaab leader. In fact, Ayrow was the only al-Shabaab leader mentioned by name in the State Department media note released March 18, 2008. The media note stated: "Al-Shabaab's leader, Aden Hashi Ayrow, has ordered his fighters to attack African Union (AU) troops based in Mogadishu. Ayrow has called for foreign fighters to join al-Shabaab in their fight in Somalia." Another State Department release noted that Ayrow was "responsible for assassination of Somali peace activist in July 2005 and multiple targeted assassinations and harassment of civil society figures, government officials, and journalists."

**B.**     **Background on Hawalas and Shidaal Express**

12.     Hawalas are alternative money remittance systems that consist of a network of money brokers who transfer funds on behalf of customers to recipients in other countries. Because Somalia does not have a strong conventional banking system, the hawala system is used by many Somalis in the United States and elsewhere to send and receive money to individuals in Somalia. While hawalas may be licensed to operate in the United States and may use United States financial accounts to make monetary transfers and remittances overseas, they also operate with a reduced and less formal paper trail and among trusted connections. For this reason, the hawala network has historically been favored by those involved in financing or transferring the proceeds of criminal activity, including terrorism. In the course of their operations, hawalas use telephones, computers, and the internet to effectuate the money transfers.

13.     Shidaal Express was a money remitting business and hawala which operated in San Diego until 2009. Shidaal Express operated as the local affiliate for Amal, an international money transfer business headquartered in the U.A.E.

14.     Under Title 18, United States Code, Section 2339A, it is a crime to provide

5

material support or resources when the defendant knew or intended that the material support or resources be used in preparation for, or in carrying out one of the enumerated offenses under the statute, which include Title 18, United States Code, Section 956 (conspiracy to kill persons in a foreign country). Under Title 18, United States Code, Section 2339B, it is a crime for a U.S. person to provide material support or resources to a foreign terrorist organization while knowing that the organization is a designated foreign terrorist organization, or that it is or has engaged in terrorist activities or terrorism. Furthermore, under Title 18, United States Code, Section 1956(a)(2)(A), it is a crime to transfer funds from a place in the United States to a place outside thereof to promote the carrying on of specified unlawful activity. "Specified unlawful activity" includes conspiracy to kill persons in a foreign country and providing material support to terrorists and foreign terrorist organizations.

## PENDING CHARGES

15.     On October 22, 2010, a federal grand jury sitting in the Southern District of California returned an indictment charging MOALIN, Mohamed Mohamed Mohamud AKA Mohamed Khadar AKA Maxamed Khadar AKA Mualin Khadar ("Khadar"), and Issa Doreh AKA Issa Dheere ("Doreh") with violations of 18 U.S.C. § 2339A(a) (material support to terrorists); 18 U.S.C. § 2339B (material support to foreign terrorist organization); 18 U.S.C. § 956 (conspiracy to kill persons in a foreign country); and 18 U.S.C. § 1956(h) (conspiracy to commit money laundering).

## SUMMARY OF THE INVESTIGATION

16.     From at least December 2007 to late April 2008, San Diego cab driver MOALIN was in direct telephone contact with Aden Ayrow, the military leader of al-Shabaab. MOALIN

6

conspired with numerous other Somalis to provide funding for al-Shabaab's violent attacks against Somalia's TFG and those who supported it. Two of MOALIN's principal co-conspirators were Khadar and Doreh. Khadar is the Imam of Masjid al-Ansar (the al-Ansar Mosque). During the relevant time period, Doreh was an employee of Shidaal Express.

17. Initially, the conspirators transferred the money directly to Aden Ayrow through Shidaal Express. The conspirators typically used false sender and recipient names to transfer the money in structured batches. Aden Ayrow was killed in a missile strike in Somalia on May 1, 2008. After Ayrow's death, MOALIN and his co-conspirators immediately sought out new contacts in Somalia to continue funding the violence. In July 2008, the conspirators sent funds to al-Shabaab through a new contact named Omar Mataan. They also sent funds to Farah Yare, the representative of another insurgent group engaged in the fighting.

## FACTS ESTABLISHING PROBABLE CAUSE

18. MOALIN, who currently resides in San Diego, was born in Somalia and became a naturalized United States citizen in July 2002. He resides at the location described in Attachment A. Lease records from the Bandar Salaam Apartments, located at 3810 Winona Avenue, San Diego, California, indicate that MOALIN has a current lease for apartment #116. MOALIN's current lease began on May 20, 2010 and is to expire on November 30, 2010. The lease indicates that #116 is leased by two people, one of whom is MOALIN. The first three pages of the lease are initialed at the bottom by "BM," and the last page of the lease has the name "Basaaly Moalin" signed next to a "Lessee" designation. The lease also includes the initials and signature of the other lessee. FBI agents interviewed a representative from Bandar Salaam Apartments in conjunction with obtaining a copy of MOALIN's lease pursuant to a subpoena. Said

7

representative informed agents that apartment #116 is a two bedroom apartment, and that in

addition to the two lessees, a third male also resides in apartment #116. In addition, San Diego

Gas & Electric records indicate that MOALIN is the account holder for the service address of

3810 Winona Avenue, #116, San Diego, California. FBI agents have recently conducted

surveillance of MOALIN and observed that on October 14, 2010, MOALIN left the Bandar

Salaam apartment complex in the early afternoon and walked to a convenience store where he

got into his cab.

19.     MOALIN uses cellular telephone number (619) 278-1189, which is

subscribed to in the name of Warsame Moalim. This affiant confirmed MOALIN's association

with (619) 278-1189 through a State of California law enforcement database (ARJIS) check,

which revealed that an individual named Basaaly Saeed Moalin reported a stolen property

incident and provided a home and work contact telephone number of (619) 278-1189. The FBI

also conducted real-time visual surveillance of MOALIN while he participated in a telephone call

on that number. Throughout the remainder of this affidavit, all references to telephone calls

involving MOALIN refer to calls either dialed from or received on (619) 278-1189.[2]

###     A.     **MOALIN's Direct Communication with Aden Ayrow**

20.     In December 2007, the FBI began intercepting MOALIN's cell phone. The

coverage revealed that MOALIN was in frequent, direct telephone contact with Aden Ayrow.

MOALIN communicated with Ayrow approximately 21 times between December 21, 2007 and

April 26, 2008.

---

[2]     To the extent this affidavit refers to telephone communications involving
MOALIN, the communications were intercepted under orders issued by one or more United
States District Judges.

21.     When speaking with Aden Ayrow, MOALIN referred to him by the code name "Shiqalow" (with multiple alternate spellings, including Sheikhalow), not "Aden" or "Ayrow." But the context establishes that "Shiqalow" was, in fact, Ayrow. For example, on January 3, 2008, MOALIN spoke with Shiqalow. Moments after ending the call with Shiqalow, MOALIN spoke with another man in Somalia, telling him, "I was talking to the man who is in charge of the youth." On another occasion, after speaking with Shiqalow, MOALIN told a relative that he was just speaking to the man from Somalia whose name MOALIN did not want to say over the telephone.[3]

22.     Furthermore, as noted above, Ayrow was killed by a missile strike in Dhusa Mareb, Somalia on May 1, 2008. On that day, one of MOALIN's contacts told MOALIN that "there is a rumor that planes targeted the house where Shikhalow, 'Slim Limbs', used to stay one hour ago." MOALIN then called several people to determine whether the news was true. MOALIN asked one man if he had "information about Dusa Marrab. Was a plane attack today?" The man replied that "last night an airplane dropped one missile on a house of three bedroom thought to be inhabited by the main man." Indeed, on May 1, 2008, the BBC reported a missile strike on the home of Aden Ayrow, identified by the BBC as the military head of al-Shabaab. The BBC report described an interview with al-Shabaab spokesman Mukhtar Robow, who told the BBC that Ayrow was killed. After May 1, MOALIN did not have any more communications with "Shiqalow."

_____

[3]     Any references to "Shiqalow" or its multiple alternate spellings herein are references to Aden Ayrow.

9

### B. MOALIN's Material Support to al-Shabaab

#### 1. January 2008: $3,900 to Ayrow

23. On December 21, 2007, MOALIN told Ayrow that he had "talked at length with the cleric" about the fund-raising project and that "it's very likely he will be sending to you very soon . . . within this week or so." Ayrow replied that he urgently needed $3,160 "as their rations for these ten days." MOALIN stated, "Leave it to me; I will take care of that issue swiftly with him and with the Saleban-clan cleric whom you talked to, by the name of Sheikh Issa[.]"

24. Immediately after this call with Ayrow, MOALIN called Doreh.[4] He told Doreh that "the cleric has just called me" and "he told me that he needs a very small amount of money." The following exchange occurred:

Basaaly[5]:    He said . . . what you call . . . "An amount of $3,000 . . . $3,600--"

Doreh:    Yes.

Basaaly:    "–is needed." And previously . . . not long ago he told me . . . what you call . . . eh . . . the area . . . the places where the fighting are going on--

Doreh:    Yes.

Basaaly:    –he said, "We are not men who use transportation or anything like that. One dollar a day per man is what we need for our forces stationed around."

MOALIN stated that he had already raised this issue with "Sheikh Mohamed" but that he did not have Sheikh Mohamed's new phone number. Doreh stated that he would raise the matter with

---

[4]    The number that MOALIN called is subscribed to by Issa Doreh and, at the beginning of the call, MOALIN referred to the other party as "Sheikh Issa."

[5]    When speaking with others on the phone intercepted by the FBI, MOALIN was regularly referred to as "Basaaly."

10

Sheikh Mohamed when he came in for morning prayers.

25. On December 28, 2007, MOALIN told Khadar that "the men have been crying out to me over the phone." Khadar replied, "I will complete the task, which pertains to the men, tomorrow, God willing."

26. On January 3, 2008, MOALIN spoke with Ayrow. Ayrow stated, "We received the three—we received the three." MOALIN replied, "Good!" Ayrow stated, "That is the amount we received." MOALIN told Ayrow that he still wanted to get the amount "to an even four" and that he would try to send more in the coming days.

27. The FBI obtained Shidaal Express transaction records for the relevant time period. The records show two $1,950 transfers to "Yusuf Mohamed Ali" in Somalia on January 1, 2008. The first transfer is from "Duunkaal Warsame Warfaa." The second transfer is from "Safiya Hersi." As demonstrated hereafter, "Duunkaal" and "Yusuf Mohamed Ali" were names commonly used by MOALIN and his co-conspirators when sending money to al-Shabaab.

28. In addition to providing money to Ayrow, MOALIN also provided his home to Ayrow. Specifically, during a January 3, 2008 telephone call with Ayrow, MOALIN told Ayrow that he could use MOALIN 's house in Mogadishu. He told Ayrow that he could bury stuff on the property "deep in the ground" and then plant trees on top. MOALIN stated that he would have his brother deliver trees to the property for that purpose. MOALIN also told Ayrow that the house has an attic where documents and weapons can be stored, and that the only problem with the house is that the tall trees make it easily identifiable from far away. Ayrow replied, "No one would know. How could anyone know, if the house is used only during the nights?" Ayrow asked for the keys to the house, and MOALIN told him how to pick them up from a man in

11

Somalia.

### 2. February 2008: $2,000 to al-Shabaab

29.　On February 3, 2008, Ayrow and MOALIN spoke. Ayrow asked MOALIN whether he had reached "Sheikh Mohamed." Ayrow stated, "We need money, man – provide some please."

30.　On February 9, 2008, Basaaly spoke with Issa Doreh and they had the following exchange:

| Basaaly: | Sheikh Issa! I was expecting something from some people, did they send you? |
|---|---|
| Doreh: | If it is what you have sent with Mohamed . . . we have sent it. |
| Basaaly: | What? |
| Doreh: | The one you sent with Mohamed . . . Is that the one Mohamed Khadar was holding? |
| Basaaly: | Yes! Did it go through? |
| Doreh: | Yes! We have sent it through that one. |
| Basaaly: | Was it the one for the young people . . . I mean the orphans or was the other. |
| Doreh: | No, no, the Dhunkaal one. |

31.　On February 13, 2008, MOALIN told Khadar that the previous night, while he was asleep, he received a call from "Mijadhub."[6] Later in the call, Khadar stated, "Well, it is good. I think Dhunkal was able to get the stuff there."

---

　　　[6]　　Translated to English, "Mijadhub" means "slim limbs" or "slim legs." Aden Ayrow was very thin and lanky. Various Somali linguists spell the word different ways, including "Muja Dhuub" and "Majodhuub."

32.     On February 14, 2008, Ayrow called MOALIN. MOALIN

asked, "Did you receive Dhunkaal's stuff?" The following exchange ensued:

Basaaly:     Dhunkaal is asking whether you received two pieces.

Ayrow:       Where? Which company?

Basaaly:     The usual . . . .

Ayrow:       It is a different company?

Basaaly:     No, no. Ours was Amal.

Ayrow:       Yes. Did you use the name Yusuf Mohamed Ali as the receiver?

Basaaly:     Yes; Yusuf Mohamed Ali, yes.

Ayrow:       Understood. I will go and look for it now . . . Is it 2,000?

Basaaly:     Yes, 2,000.

33.     The Shidaal Express records show that, on February 13, 2008, one transfer of

$1,300 and a second transfer of $700 were sent from San Diego to Dhusa Mareb, Somalia. The

sender is listed as "Dhunkaal Warfaa." The recipient is listed as "Yusuf Mohamed Ali" – the

same recipient name used in the previously-described January 2008 transactions.

34.     The following month, MOALIN learned of Al-Shabaab's designation as a foreign

terrorist organization (FTO), and discussed the designation with others. For example, on March

19, 2008, MOALIN told another man on the telephone that "the American spy agency has added

Al-Shabab group to the terrorist list." When Indho asked whether the UN recognized this action,

MOALIN replied, "UN has nothing to do with it. The Americans can do an economic embargo

to anyone it desires." MOALIN also told the man that the American pronouncement specifically

mentioned "Adan." In addition, on March 20, 2008, MOALIN listened on his cell phone to a

13

BBC report about the U.S. designation of al-Shabaab as a foreign terrorist organization.

MOALIN listened to a BBC interview with al-Shabaab's spokesman, Muqtar Robow. Robow

stated: "I am happy to hear that the Americans added Al Shabab to the list of the international

terrorists organization as you said, we thank God. . . . We were very happy to be recognized as

terrorist."

### 3.     April 2008: $3,000 to al-Shabaab

35.     On April 12, 2008, after MOALIN learned that Al-Shabaab had been designated

as a FTO, Ayrow told MOALIN that "it is time to finance the jihad." He stated that "I am now in

Dhusa Mareb" and "the Ethiopians are in Adaado." MOALIN replied, "I was told that they are

only a few men so why do you not prepare to finish them off?" Ayrow replied, "We will try,

God willing."

36.     In addition, Ayrow again complained to MOALIN about the lack of finances to

support the fighting. He stated, "I don't think if it is possible two hundred men will have bullets

to shoot at the enemy they can see." He stated, "if we had bullets for the enemy we would have

destroyed them." MOALIN replied that he will try his best and will send something to Ayrow

wherever he is located.

37.     In the days after, MOALIN continued his fundraising efforts on behalf of al-

Shabaab, including a conversation on April 17, 2008 in which MOALIN told Khadar that "calls

are coming from the man." MOALIN asked, "So, what should I tell the man? What should I

say? Can we give him a specific date?" Khadar replied that they could not give a specific date,

but "God willing, we have not forgotten the men. It will be alright, God willing." The following

exchange ensued:

14

| Khadar: | Do you have any money? |
|---|---|
| Basaaly: | Personally, I will pay whatever I can contribute as charity, but . . . |
| Khadar: | What about the others? Do they have anything? |
| Basaaly: | ....I and others are ready to contribute . . . |
| Khadar: | Right. . . . |
| Khadar: | Okay Basal, this is what you should do . . . We will meet. God willing, we will see each other. Lately, I am involved with so many other things. God willing, we will try our best. Do you understand? |
| Basaaly: | On Friday, at the mosque– |
| Khadar: | Right. |
| Basaaly: | –keep those individuals you need behind . . . |
| Khadar: | Right. |
| Basaaly: | Thirty people or twenty that you trust will be enough; you tell them to pay this much, something they can afford . . . |
| Khadar: | God willing it will be alright. |
| Basaaly: | Yes. |
| Khadar: | It will be alright. |
| Basaaly: | Yes. |
| Khadar: | Don't worry. |

38.     On April 23, 2008, MOALIN called the Shidaal Express and learned that the
money that had been sent had not been picked up. Moments later, MOALIN spoke with Khadar.
Khadar asked, "Did Muja Dhuub call you?" MOALIN replied that it was a missed call. The
following exchange occurred:

15

| Basaaly: | Did Dhunkal go? |
|---|---|
| Khadar: | Dhunkal left. Dhunkal left. |
| Basaaly: | [Laughing] |
| Khadar: | Dhunkal left. Dhunkal left. |

MOALIN then asked Khadar about the transaction details. Khadar stated that it was sent to "where he used to go" and that although he could not remember the exact names used in the transaction, he believed it was "Abdinasir." MOALIN replied that it wasn't Abdinasir, but "it was like Ali . . . Ahmed."

39.     On April 24, 2008, MOALIN asked Ayrow, "Did you receive the little that we sent you?" Ayrow stated that he has been away for three days. MOALIN advised Ayrow that "three bundles" were sent from San Diego via Amal, and that the recipient name is "Dhunkal Yusuf Mohamed." MOALIN stated: "They will break it because they do not want to show that the transfer was one; so it is possible that they broke it into transfers of one thousand but the name of the recipient is the same."

40.     Later that day, MOALIN spoke with Khadar. MOALIN stated, "I spoke with Majadhuub last night" and "I told him that something was coming his way." The following exchange occurred:

| Khadar: | That is right, God willing; may God bless us. It is possible that we will send some more. |
|---|---|
| Basaaly: | God is great, God is great. You can imagine how happy he was in this matter. |
| Khadar: | Right. |
| Basaaly: | He said, "We needed it for some operation–the action now . . . we |

16

will be able to do something now."

Khadar:     We don't know about the future, but it is possible that . . .

Basaaly:    Hmm.

Khadar:     There are many men who are saying, "We will give contribution now."

41.     On April 25, 2008, Ayrow told MOALIN, "I received 1,900 from the place."

MOALIN replied, "Was it only 1,900?" The call disconnected. About 30 minutes later,

MOALIN called Khadar and stated, "I have heard from Muja Dhuub." The following exchange

occurred:

Basaaly:    He told me . . . how much stones did we sent him?

Khadar:     It was three stones.

Basaaly:    Yes, naturally they sent it in installments. I believe.

Khadar:     What did he say?

Basaaly:    Two stones minus one–

Khadar:     Yes.

42.     About an hour later, MOALIN called Ayrow and asked, "How much did you say

you received of the stones?" Ayrow replies, "19." The following exchange ensued:

Basaaly:    Of course, 11–cannot be sent under the same name; it must be
            handled in a certain way . . . So–ahem look–it is the
            same–ahem–ahem, it is the same method. So search it like that,
            God willing. It was three stones.

Ayrow:      I understand – very well. What was the name? Yusuf?

Basaaly:    It is Dhunkal Yusuf Mohamed.

MOALIN then explained that, at the hawala, "they do not charge us the fee that they normally

17

charge people." He stated, "That is how they help us." MOALIN explained that the "head of the place" is "Sheikh Issa" and that "he is the administrator and he helps us with that much."

43. The Shidaal Express records reflect: (1) an April 23, 2008 transfer for $1,900 from "Abdiwali Ahmed" to Dunkaal Mohamed; and (2) an April 25, 2008 transfer for $1,100 from "Zahra Warsame" to "Mohamed Yusuf Dunkaal."

### 4. Ayrow is Killed

44. On May 1, 2008, after MOALIN confirmed that Ayrow had in fact been killed, he called Khadar and the following exchange occurred:

| | |
|---|---|
| Basaaly: | Naturally, I think you have heard what happened? |
| Khadar: | Man, I am sitting in front of it and looking at it now. How did it happen? |
| Basaaly: | Man, mainly the news is that even Muja Dhuub is among them. |
| Khadar: | The people who are gone. |
| Basaaly: | Yes. They said that Robow has just announced it now.[7] |

45. After Aden Ayrow's death, MOALIN searched for another contact for whom he could continue his fundraising, and discussed his desire to continue fundraising and supporting Al-Shabaab with others. For example, on May 8, 2008, MOALIN told a man named Ali Mahad that "now that man is gone we want to have contact with another man God willing. So we can continue the assistance." In addition, on June 16, 2008, MOALIN spoke with an unidentified man and stated, "I don't want people to get disconnected." He continued: "I have a meeting at

---

[7] As noted previously, Robow was a prominent spokesman for, and leader of, al-Shabaab.

18

one of two mosques and tell them to continue the struggle. We will move the system to another place God willing since the leader is gone." In addition, on June 2, 2008, MOALIN told a man in Somalia that "Robow" is "my boss." MOALIN stated that so long as there are "infidels, Ethiopians and apostates in the country," MOALIN is "under the command" of Robow.

### 5. July 2008: $5,000 to Farah Yare

46.     By July, it appeared that MOALIN had contacted another person to whom he could send financial support when he spoke to a man in Somalia named Farah Yare on July 1, 2008. Farah Yare reported to MOALIN on the fighting in the Mataban region. He stated that 18 men had been martyred, but that the enemy was destroyed. He stated, "We were fighting from morning til 2:00 p.m. So we were doing burials, to regroup our army." As a follow up to the conversation the day before, on July 2, 2008, MOALIN, Khadar and Isse Doreh had a conference call with Farah Yare. During the call, Yare described in detail the recent fighting against the Ethiopians, stating, "We caught up with them and we truly destroyed them. The young boys that were here with us also hit them from another side . . . ." Yare stated that "other groups of fighters joined the fight and it continued for four hours without stopping."

47.     On July 3, 2008, MOALIN told Yare that, because there is no unified administration for all the Islamic organizations joined in the fighting, "we must get the name of the highest person who is responsible for the finance from your group, the group of the youth [al-Shabaab] and the other group."

48.     On July 8, 2008, MOALIN asked Issa Doreh if he had sent the money. Doreh replied that the money had already been sent, that the recipient was "Farah Yare," and that the sender was listed as "Dhunkaal Hersi." MOALIN told Doreh that he had been trying to organize

19

men as far away as Europe and Canada. He stated, "So, so whatever God gives us, hopefully let them get it. Let them just feel the pain." Moments later, MOALIN told Farah Yare that $5,000 had just been sent to him through Amal and that "the name is Dhunkaal."

49.     On July 13, 2008, MOALIN, Doreh, and others had a conference call with Farah Yare. MOALIN asked if "the small amount has reached" him yet, but Yare stated that he had not received the money yet. MOALIN assured him the matter would be resolved, noting that the sheikh on the conference call [i.e., Doreh] is "a member of the management of the Amal Company." Yare then described the current fighting. He noted that it is difficult to replace spent ammunition. One of the call participants asked if it is possible "to find the weapons to fight." Yare replied that "one rocket propelled grenade, which loads in the front . . . , fired at them it cost $270 just that single rocket." MOALIN told Yare that the "five cartons" are on their way, but that the hawala would break the amount into several transfers.

50.     On July 21, 2008, Yare told MOALIN that he had received only $1,250 and $1,030. MOALIN replied that "you should have informed me about that . . . because it is wrong that they don't pay out the money."

51.     The Shidaal Express records reflect that, on July 15, 2008, there was a transfer of $1,250 to "Farah Yare" from "Dukan Hersi" and a $1,030 transfer to "Farah Yare" from "Hersi Dunkal." Issa Doreh's telephone number was listed as the sender's number for the $1,030 transfer.

### 6.     $2,000 to Omar Mataan

52.     In addition to working with Farah Yare, MOALIN also reached out to others in Somalia after Ayrow's death. On July 11, 2008, MOALIN spoke with a man named Mahad in

20

Somalia. He explained to him that he is part of a group "who support the men who are fighting" and who raise money for the cause. MOALIN explained that he is not the "top responsible guy" as "there are big shots scholars who give utmost importance to those matters." MOALIN explained that they have previously sent the money "under the name Dhunkaal" but that "when the man went away, without first giving us another contact, the whole link was lost." Mahad instructed MOALIN to send the money to "Omar Mataan." Later that day, MOALIN spoke with Omar Mataan in Somalia. He told Mataan that "we will use Dhunkal . . . and I will write your name as it is: Omar Mataan."

53.     On July 18, 2008, during a call with an unidentified male, MOALIN asked the man if he knew Omar Mataan. When the man replied negatively, MOALIN stated, "He is one of the guys in the region and one of the Youth." On that same day, MOALIN spoke to a Shidaal Express representative, and asked him if he had received the $2,000. MOALIN instructed him send it to "the one we usually send to, Dhunkal." On July 19, 2008, MOALIN again called the Shidaal Express representative and confirmed that the $2,000 had been transferred to Mataan.

54.     On July 23, 2008, MOALIN stated to Doreh, "about the youngsters . . . there were two cartons that I allocated for them." The next day, MOALIN learned from a Shidaal Express employee that $1,650 had been received. MOALIN replied that "it should have been two cartons" and was still short $350.

55.     The Shidaal Express records reflect that on July 23, 2008, an amount of $1,650 was sent to "Omer Mataan" in Dhusa Mareb. The sender's name was listed as "Kulan Muhumed" but MOALIN's phone number was listed as the sender's number.

56.     On August 3, 2008, MOALIN learned that "the 350" was sent.

21

57.     The Shidaal Express records show a $350 transfer from "Hashi Mohamed" to "Omer Mataan" on August 5, 2008, bring the total transferred to Mataan to an even $2,000.

## BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANT

58.     Based on the facts set forth herein, there is probable cause to believe that MOALIN has been involved in a conspiracy to commit violations of Title 18, United States Code, Section 2339A(a) (material support to terrorists); Title 18, United States Code, Section 2339B (material support to foreign terrorist organization); Title 18, United States Code, Section 956 (conspiracy to kill persons in a foreign country); and Title 18, United States Code, Section 1956(h) (conspiracy to commit money laundering). In addition, there is probable cause to believe that in addition to conspiring with Doreh and Khadar, MOALIN solicited several other people in an attempt to raise money to be sent to Ayrow, Farah Yare, and Omar Mataan. Specifically, as discussed in paragraph 37, MOALIN planned to solicit at least 20 to 30 individuals in an attempt to collect money. Moreover, as discussed in paragraph 48, MOALIN's fundraising efforts extended beyond San Diego in that he sought to solicit funds from those in Europe and Canada as well. In addition, as was detailed in paragraph 49, he, Doreh, and others talked with Farah Yare in a conference call in which they discussed the current fighting, and how little was needed to finance a rocket propelled grenade, for example. While this investigation has led to the identification of some of MOALIN's co-conspirators, it has not resulted in the identification of all of these individuals. Based upon the number of potential co-conspirators, who number at least twenty to thirty people, and likely many more, residing in the United States, Canada and Europe, there is probable cause to believe that MOALIN kept records of the various individuals involved, including records of those who had donated money, those who had pledged

22

money but who had not yet paid, and other potential donors. MOALIN made reference to those records on a couple of occasions, including in a conversation on April 12, 2008 in which he discussed giving a list of donors to another man who would be tasked with the job of collecting funds from those on the list, as well as in a conversation with Farah Yare on July 4, 2008 in which MOALIN told Farah Yare, "...we have a meeting on Friday so that people can give something; also we already have the list of people willing to contribute." In addition to keeping records on donors and potential donors, MOALIN also kept track of contact information for those to whom he was sending money as evidenced by a discussion he had on January 1, 2008 with a fellow fundraiser in which he chided the fellow fundraiser for not contacting MOALIN prior to sending money abroad and stated, "...But if you want the address and how to address things to the right people, ask me and I will tell you."

59.     As described in paragraphs 32 and 38-39, the illegal monetary transactions were made using false names, often both for the sender and the recipient. But this investigation has revealed that MOALIN also frequently sent money to Somalia for reasons other than financing terrorist activities. For example, a review of Shidaal Express electronic and paper records revealed transfers by MOALIN to Somalia for personal and business reasons, and that he frequently used his own name when making such transfers. Put simply, MOALIN would frequently use his own name on transfers for personal or business reasons, but would routinely use false names when sending money to Ayrow or Farah Yare. Shidaal Express regularly created paper receipts that customers would receive when they made a transaction, a copy of which remained with Shidaal Express. Accordingly, the recovery from MOALIN's residence of any paper receipts for money transmittals made in his own name would provide circumstantial

23

evidence of his knowledge of the illegal nature of the money transfers made using false names.

60.     Intercepted emails and phone calls show MOALIN's ongoing ties to Somalia, including that he had a son and other contacts there. In addition, MOALIN's emails demonstrate that he was in the process of building a home in Somalia, other than the one that he offered to Ayrow in the January 3, 2008 call, and that someone else was overseeing the building of the house on MOALIN's behalf and would often send photographs of the project's progress to MOALIN. Because MOALIN has immediate family members, as well as two homes, in Somalia, I have reason to believe that MOALIN continues to send money to Somalia. Given the fact that the banking system in Somalia can be unreliable, hawalas are one of the few ways that people, including MOALIN, can send money to Somalia. As stated above, those hawala receipts, as well as any other receipts for monetary transactions, in which MOALIN provided his real phone number and/or his real name and/or any other true identifying information would evidence his knowledge of the illegal nature of the monetary transactions he previously conducted which are described above.

61.     In December 2008, MOALIN traveled to Somalia and he returned in February 2009. This investigation has revealed that in the weeks leading up to his travel, MOALIN was still showing support for al-Shabaab. For example, on November 20, 2008, he told another man on the telephone that, "...Sheikh Mukhtar Robow is my boss." In addition, in preparation for his trip, on November 29, 2008, he called a man to seek advice on what to do with a book of names and phone numbers that he said he did not want to save on his cell phone, but included information that he needed. MOALIN asked to leave the book with the man for safekeeping, and said that he would call when he needed information during his trip. The other man agreed to

24

hold MOALIN's book.

62.     Based upon my training and professional experience, as well as my own personal experience, it is my opinion and belief that the kinds of above-described records, as contained in phone books, ledgers, notebooks, and other documentation described in Attachment B, are generally kept in a person's home. It is also my opinion and belief that these kinds of records are frequently kept for long periods of time in a person's home in that they contain relevant contact information for personal and community contacts that may be needed in the future. MOALIN himself demonstrated his awareness that lists of donors and potential donors could prove helpful in the future in a July 4, 2008 phone call with Farah Yare discussed in paragraph 58. In that call, having found another insurgent to whom he could send funds, MOALIN, armed with the names of potential donors already, relied upon that information to assure Farah Yare that he could get the job done.

63.     In addition, in that MOALIN demonstrated a commitment to providing funds for terrorist activities, as well as pride in his efforts, it is my belief that he would continue to maintain the above described records, as well as phone books and other documentation as described in Attachment B. This is corroborated by the fact that the work of MOALIN and his co-conspirators included individuals from the United States, Canada, Europe, and Africa, all of whom were contacts that would be difficult to reassemble if the information was simply thrown away. MOALIN described his efforts across the United States in a call on January 15, 2008 when he told a man on the phone, "I am responsible on their behalf for Ohio...what do you call...the State of Ohio, eh...California....eh...what you call...eh...Missouri. I am their representative for all the connections for these areas and the link who does the job for them." In

25

addition, given that MOALIN was not deterred from his fundraising and transmitting of funds when al-Shabaab leader Aden Ayrow was killed, and that MOALIN was quickly able to reorganize and find new recipients for the funds he collected, evidence exists that this work was ongoing and would thus require MOALIN to keep the kinds of records described in Attachment B.

64.    Moreover, it is my belief that there is probable cause to believe that MOALIN would continue to keep the items described in Attachment B, including documentation about al-Shabaab's ideology and acts of violence, as well as documentation about other insurgent groups. MOALIN demonstrated a continuing commitment to the al-Shabaab leadership as evidenced by his work to find Omar Mataan and his allegiance to Robow as described in paragraphs 45, 52-57 and 61. In addition, prior to his travel in December, MOALIN remained informed about al-Shabaab's actions. For example, on October 28, 2008, MOALIN confirmed with another man that two trucks full of al-Shabaab militants and explosive materials had been captured. MOALIN also stated that he had not been successful in reaching other fighters, including Jimcaale "Argaagah," who MOALIN described as the second in command responsible for the defense of a territory all the way to the Water Reservoir, and Mohamed Dahir Guled, who MOALIN described as a top advisor. Further evidence exists in a call on July 8, 2008 when MOALIN and Doreh discussed their fundraising, and the importance of their own work to the cause. Specifically, they stated:

Doreh:      It will end in success; it will end in success. Is not that we paying . . . we are not sparing anything as long as we are able to.

Basaaly:    Yes, yes that is right. We are not less worthy than the guys fighting.

26

Case 3:10-cr-04246-JM   Document 92-7   Filed 10/09/11   Page 27 of 41

Doreh:    Yes, that's it. It's said that it takes an equal effort to make a knife; whether one makes the handle part, hammers the iron or bakes it in the fire.

By his own words, MOALIN evidenced a deep-seated commitment to funding al-Shabaab and the other insurgent militias. On April 21, 2008 MOALIN stated that even if the "Ethiopians are evicted or a peace treaty is signed," the fighting would not stop. In the months before he departed for Somalia, MOALIN reaffirmed his commitment to al-Shabaab and other insurgent groups in a conversation on September 14, 2008 in which MOALIN discussed al-Shabaab with another man. The man stated, "Buddy, I am not sure how al-Shabaab is going to solve these things." MOALIN responded by saying that he would support al-Shabaab "no matter what they do as long as they are harming the infidels. . .my friend, whether they do right or wrong. . . ." In addition to sharing his beliefs with these people, MOALIN also encouraged his own son to fight against the infidels. In a call on August 13, 2008, MOALIN's son told him that he wanted an education, but MOALIN told his son, "Don't you want to defend the country? Don't you want to defend the country from the infidels? What does 'I want education' mean? What is the use for your education if you don't take part in defending the country?" Given that the fighting in Somalia continues to this day and that MOALIN stated his intent to support al-Shabaab and other insurgent groups engaging in the fighting, there is probable cause to believe that the records sought, as described in Attachment B, would be found in the location described in Attachment A.

65.    During 2008, the FBI conducted periodic visual surveillance of MOALIN over several months. The surveillance revealed that his routine consisted of driving his cab in the afternoons, often into the early morning hours. He would then head home to his former apartment. Agents also observed that MOALIN would generally leave his home the following

27

day around mid-day to eat and then resume driving his cab for work. As such, this routine evidenced that were MOALIN to keep any of the items described in Attachment B, that they would likely be at his place of residence.

## BASIS FOR SEARCHING FOR COMPUTER AND ELECTRONIC MEDIA EVIDENCE

66.     In addition to intercepting MOALIN's cell phone conversations, the FBI also intercepted MOALIN's emails from the email address basaaly@live.com.[8] The intercepts of basaaly@live.com revealed that MOALIN also had another email address basaaly@hotmail.com, further demonstrating his regular use of computers. Based upon my experience and training and consultation with other FBI agents and computer forensic examiners, I know that supporters of terrorist organizations and other insurgent groups often use electronic means to gather information and communicate with co-conspirators. In addition, the intercepts from MOALIN's email address revealed that he regularly accessed his email address, and that he communicated with email address faaraxyare1@hotmail.com on several occasions. Based upon my training and experience and in consultation with FBI translators, in Somali, the letter "x" is pronounced as the letter "h" is pronounced in the English language. In addition, in a January 20, 2008 call, MOALIN gave his email address, basaaly@live.com, to a third party and told him to give it to Farah Yare. In turn that person provided the faaraxyare1@hotmail.com to MOALIN as the email address for Farah Yare. In providing his own email address, MOALIN instructed the man, "Tell him that Basal said to send his email so he can get all the information he needs." Based upon this information, I believe that the user of faaraxyare1@hotmail.com is the "Farah Yare"

---

[8]     These communications were also intercepted under orders issued by one or more United States District Judges.

28

discussed above in paragraphs 46 through 51.

67.     In addition to the evidence described above, evidence that MOALIN had a
computer includes an August 22, 2008 phone call in which MOALIN placed a call to his home
and gave his computer password to two individuals.  MOALIN also displayed knowledge about
computers in a December 22, 2007 call when he told the other caller that a website that the two
had visited recently was infected with a virus.

68.     In addition, as discussed above, MOALIN was aware of current events in
Somalia, including the ongoing armed struggle.  Based upon my training and experience, I know
that one of the ways that people stay informed regarding terrorist organizations and their work is
through websites, including chatrooms, which provide reporting that may not be covered by the
mainstream media.  In addition, I know that there are numerous websites that focus on news from
Somalia, including hiraan.net, garoweonline.com, somaliaonline.com, mareeg.com,
waagacusub.com, and websites believed to be run by al-Shabaab, including kataaib.net,
kataaib.info, alkataaib.ws, and almujaahid.com.  In addition, MOALIN himself used the internet
to learn information about Somalia as evidenced by a call on December 22, 2007 in which
MOALIN gave a website url, ileys.org, to a fellow sympathizer and told him that the website
contained information about Galgadud, a region of Somalia.  In addition, in two other calls on
May 16 and July 12, 2008, MOALIN received calls from other people seeking news update about
Somalia because their own computers were not working.  Internet search history could reveal
how MOALIN remained informed on the events in Somalia and his knowledge of actions of the
groups he was supporting.

69.     An additional reason why I believe that MOALIN would continue to keep the

29

items sought in Attachment B is based in the nature of computers and electronic storage devices. As described in Attachment B and discussed above, this application seeks to search and seize items found in the location described in Attachment A that may be found in computers and other electronic storage devices. I submit that if a computer or other electronic storage device as described in Attachment B is found in the location described in Attachment A, there is probable cause to believe that the items for which agents will search pursuant to Attachment B will be found therein. Based on my knowledge, training, and experience and the knowledge, training, and experience of my fellow agents with whom I have consulted, I know that computers have word processing and spreadsheet capabilities and email address books or contact folders which are suitable for storing the records sought as set forth in Attachment B. In addition, based upon this knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed. Electronic files downloaded to a computer or an electronic storage device can be stored for years. Even when files have been deleted, they can be recovered months or years later using forensic tools as described below. This is because when a lay person "deletes" a file on a computer, the data contained in the file does not actually get deleted. Instead, the data often remains on the computer or other electronic storage device until it is overwritten by new data. Therefore, deleted file, or remnants of deleted files, may reside in free space or slack space–that is , in space on the storage medium that is not currently being used by an active file–for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. In addition, files that have been viewed via the internet are sometimes automatically downloaded into a temporary internet directory or "cache."

The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed internet pages or if a user take steps to delete them. Based upon the discussion above, there is probable cause to believe that evidence of MOALIN's knowledge of al-Shabaab's designation as an FTO, as well as the violent activities al-Shabaab and other insurgent groups in Somalia, may exist in any electronic media, as described in Attachment B that may be found in the location described in Attachment A.

## COMPUTER SEARCH PROTOCOL

70. With the approval of the Court in signing the warrant, the agents executing the search warrant will employ the following procedures regarding computers and other electronic storage devices, including electronic storage media, that may contain data subject to seizure pursuant to this warrant:

### Forensic Imaging

a. After securing the premises, or if sufficient information is available pre-search to make the decision, the executing agents will determine the feasibility of obtaining forensic images of electronic storage devices while onsite. A forensic image is an exact physical copy of the hard drive or other media. A forensic image captures all of the data on the hard drive or other media. A forensic image captures all of the data on the hard drive or other media without the data being viewed and without changing the data in any way. Absent unusual circumstances, it is essential that a forensic image be obtained prior to conducting any search of the data for information subject to seizure pursuant to this warrant. The feasability decision will be based upon the number of devices, the nature of the devices, the volume of the data to be

31

imaged, the need for and availability of computer forensics specialists, the availability of the imaging tools required to suit the number and nature of the devices found and the security of the search team. The preference is to image onsite if it can be done in a reasonable amount of time and without jeopardizing the integrity of the data and the safety of the agents. The number and type of computers and other devices and the number, type, and size of hard drives are of critical importance. It can take several hours to image a single hard drive – the bigger the drive, the longer it takes. As additional devices and hard drives are added, the length of time that the agents must remain onsite can become dangerous and impractical.

        b.      If it is not feasible to image the data on-site, the computers and other electronic storage devices, including any necessary peripheral devices, will be transported offsite for imaging. After verified images have been obtained, the owner of the devices will be notified and the original devices will be returned within thirty (45) days of seizure absent further application to this court.

        c.      After obtaining a forensic image, the data will be analyzed to identify and extract subject to seizure pursuant to this warrant. Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment and software. There are literally thousands of different hardware items and software programs, and different versions of the same program, that can be commercially purchased, installed and custom-configured on a user's computer system. Computers are easily customized by their users. Even apparently identical computers in an office environment can be significantly different with respect to configuration, including permissions and access rights, passwords, data storage and security. It is not unusual for a computer forensic examiner to have to obtain

specialized hardware or software, and train with it, in order to view and analyze imaged data.

d.      Analyzing the contents of a computer or other electronic storage device, even without significant technical challenges, can be very challenging. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. The computer may have stored information about the data at issue: who created it, when and how it was created or downloaded or copied, when it was last accessed, when it was last modified, when it was last printed and when it was deleted. Sometimes it is possible to recover an entire document that never was saved to the hard drive if the document was printed. Moreover, certain file formats do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database and spreadsheet applications do not store data as searchable text. The data is saved in a proprietary non-text format. Documents printed by the computer, even if the document never was saved to the hard drive, are recoverable by forensic programs but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, a particular relevant piece of data does not exist in a vacuum. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which user had logged in, whether users share passwords, whether the computer was connected to other computers or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting at the

33

keyboard.

        e.      It is often difficult or impossible to determine the identity of the

person using the computer when incriminating data has been created, modified, accessed,

deleted, printed, copied, uploaded or downloaded solely by reviewing the incriminating data.

Computers generate substantial information about data and about users which generally is not

visible to users. Computer-generated data, including registry information, computer logs, user

profiles and passwords, web-browsing history, cookies and application and operating system

metadata, often provide evidence of who was using the computer at a relevant time. In addition,

evidence such as electronic mail, chat sessions, photographs, videos, calendars, and address

books stored on the computer may identify the user at a particular, relevant time. The manner in

which the user has structured and named files, run or accessed particular applications, and

created or accessed other, non-incriminating files or documents, may serve to identify a particular

user. For example, if an incriminating document is found on the computer but attribution is an

issue, other documents or files created around that same time may provide circumstantial

evidence of the identity of the user that created the incriminating document.

        f.      Analyzing data has become increasingly time consuming as the

volume of data stored on a typical computer system and available storage devices has become

mind-boggling. For example, a single megabyte of storage space is roughly equivalent to 500

double spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is roughly

equivalent to 500,000 double-spaces pages of text. Computer hard drives are now being sold for

personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data. And, this data

may be stored in a variety of formats or encrypted (several new commercially available operating

systems provide for automatic encryption of data upon shutdown of the computer. The sheer volume of data has extended the time that it takes to analyze data. Running keyword searches takes longer and results in more hits that must be individually examined for relevance. And, once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

g.    Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including hashing tools to identify data subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files. The identification and extraction process, accordingly, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of imaging, absent further application to this court.

h.    All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## Genuine Risks of Destruction

71.    Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. In this case, only if the subject receives advance warning of the execution of this warrant, will there be a genuine risk of destruction of evidence.

## Prior Attempts to Obtain Data

72.    The United States has not attempted to obtain this data by other means.

## CELL PHONE SEARCH PROTOCOL

73.     It is not possible to determine, merely by knowing the cellular telephone's make, model, and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digit assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services, and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

74.     Following the issuance of this warrant, I and my fellow agents will seize any cellular telephones recovered in the location described in Attachment A, pursuant to this warrant

as described in Attachment B, and subject them to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

75. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## REQUEST TO SEAL

76. As described herein, this is an ongoing investigation in which only some of MOALIN's co-conspirators have been identified. Premature disclosure of the existence or contents of this affidavit, the search warrant, or the search warrant application could result in destruction of or tampering with evidence and/or result in flight. Accordingly, I request that this affidavit, the search warrant and search warrant application, the sealing order, and any other related papers be filed under seal.

## CONCLUSION

77. Based on the facts set forth herein, and on my training and experience in investigating cases involving violations of federal law and other experienced agents with whom I have consulted, I submit there is probable cause to believe that the following offenses have been committed: Title 18, United States Code, Section 2339A(a) (material support to terrorists); Title 18, United States Code, Section 2339B (material support to foreign terrorist organization); Title 18, United States Code, Section 956 (conspiracy to kill persons in a foreign country); and Title

18, United States Code, Section 1956(h) (conspiracy to commit money laundering). I also

submit there is probable cause to believe that evidence of the foregoing violations as described in

Attachment B will be found at the location as described in Attachment A.

Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
this 29th day of October, 2010.

HONORABLE LOUISA S. PORTER JAN M. ADLER
United States Magistrate Judge

38

## ATTACHMENT A

## LOCATION TO BE SEARCHED

The 2 bedroom apartment located at 3810 Winona Avenue, #116, San Diego, California which is located on the first floor of the apartment complex located at 3810 Winona Avenue.

The apartment complex located at 3810 Winona Avenue is a 2 story tan stucco building with horseshoe courtyards. The complex's main parking lot is on the southern end of the complex. As you enter the complex from the main parking lot, apartment #116 is located on the first floor facing the second courtyard on the right, which faces the apartment complex's playground area. The apartment is marked with the number "116."

## ATTACHMENT B

## ITEMS TO BE SEIZED

Certain items, records, and things limited to the items below, including physical items and electronic data to include deleted data, remnant data, and slack space, including:

A.     Documents, items, or records, including all temporary and permanent electronic files and records relating to, concerning, or evidencing (1) the collection and/or transmission of money to Somalia, including hawala receipts; or (2) the attempt to conceal or concealment of the sources and recipients of funds collected and transmitted to Somalia; or (3) the ownership of property in Somalia between December 2007 and the present;

B.     Documents, items, or records, including all temporary and permanent electronic files and records relating to, referencing, concerning, or evidencing knowledge of Mohamed Mohamed Mohamud AKA Mohamed Khadar AKA Maxamed Khadar AKA Mualin Khadar, Issa Doreh AKA Issa Dheere, Dhunkal, Dhunkaal, Duunkaal Warsame Warfaa, Dhunkaal Warfaa, Dhunkal Yusuf Mohamed, Dunkaal Mohamed, Mohamed Yusuf Dunkaal, Dhunkaal Hersi, Dukan Hersi, Hersi Dunkal, Safiya Hersi, Yusuf Mohamed Ali, Zahra Warsame, Abdinasir, Ali Ahmed, Abdiwali Ahmed, Kulan Muhumed, Hashi Mohamed, the armed conflict in Somalia, al-Shabaab, Aden Ayrow AKA Shiqalow AKA Sheikhalow AKA Mijadhub AKA Muja Dhuub AKA Majadhuub, Mukhtar Robow AKA Abu Mansur, Farah Yare, Omar Mataan AKA Omer Mataan, and any other individuals who are members of or support al-Shabaab or any other group involved in armed conflict in Somalia;

C.     Notebooks, address books, phone books, calling cards, ledgers, date books, calendars, contact lists, and money transmittal receipts;

D.     Items, documents, including all temporary and permanent electronic files and records, and effects which demonstrate residency and/or dominion and control of the places to be searched, including but not limited to: keys, receipts, bills, cancelled checks, correspondence, rental agreements and records, property acquisition records, utility and telephone records and bills, internet/cable provider statements and receipts, financial documents such as tax returns, bank records, safety deposit records, credit card and bank records, travel documents and personal identification documents;

E.     All computer systems, software, peripherals and data storage devices, including cell phones, to be seized and searched for the items identified in paragraphs A through D above, in accordance with the "Computer Search Protocol" and "Cell Phone Search Protocol" provided in the affidavit submitted in support of this warrant; and

F.     User-attribution data to include data reflecting who used or controlled the

computer or electronic storage device at or around the time that data reflecting criminal activity within the scope of this warrant was created, accessed, deleted, modified, copies, downloaded, uploaded or printed.  User-attribution data includes registry information, computer logs, user profiles and passwords, web-browsing history, cookies, electronic mail stored on the computer or device, electronic address books, calendars, instant messaging logs, electronically, stored photographs and video, file structure and user-created documents, including metadata;

which constitute evidence, or property designed for use, intended for use, or used in violations of Title 18, United States Code, Section 2339A(a) (material support to terrorists); Title18, United States Code, Section 2339B (material support to foreign terrorist organization); Title 18, United States Code, Section 956 (conspiracy to kill, maim or injure persons in a foreign country); and Title 18, United States Code, Section 1956(h) (conspiracy to commit money laundering).